# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ANDRE ADIPUTRA, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>THE BOEING COMPANY, et al.,<br><br>    Defendants. | No. 07 C 0250<br><br>Honorable John F. Grady |
| PURBO JUSTANTORO, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>THE BOEING COMPANY, et al.,<br><br>    Defendants. | No. 07 C 1387<br><br>Honorable John F. Grady |
| XU KAI ZU, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>THE BOEING COMPANY, et al.,<br><br>    Defendants. | No. 07 C 4845<br><br>Honorable John F. Grady |
| NURANDINI ADI, et al.,<br><br>   Plaintiffs,<br><br> v.<br><br>THE BOEING COMPANY, et al.,<br><br>    Defendants. | No. 07 C 4954<br><br>Honorable John F. Grady |

# DEFENDANTS' JOINT MEMORANDUM OF LAW IN
# SUPPORT OF THEIR MOTION TO DISMISS ON THE GROUNDS
# OF FORUM NON CONVENIENS

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT ..................................... 1

II.     BACKGROUND ............................................................................................... 4

        A.      The Accident and Resulting Investigation ............................................. 4

        B.      Indonesian Civil Aviation ...................................................................... 6

        C.      The Flight 91 Claims History and Litigation ......................................... 6

III.    ARGUMENT ................................................................................................... 8

        A.      Indonesia Is an Available and Adequate Alternative Forum ................... 9

                1.      Indonesia is an available forum ................................................. 10

                2.      Indonesia is an adequate forum .................................................. 10

        B.      The Private Interest Factors Strongly Favor Dismissal ....................... 12

                1.      The ease of access to sources of proof factor favors Indonesia .............. 12

                        a.      Evidence regarding the Releases is in Indonesia ...................... 12

                        b.      Critical liability evidence is in Indonesia.................................. 13

                        c.      Damages evidence is in Indonesia .............................................. 15

                2.      Many critical witnesses are beyond the reach of compulsory
                        process.................................................................................... 16

                3.      In contrast, all relevant evidence in Defendants' control is outside
                        Illinois and will be available in Indonesia ................................. 17

                4.      It is likely not possible to join Mandala and is impossible to join
                        Angkasa Pura II in this case.................................................... 18

                5.      An Indonesian factfinder can view the accident site ............................ 19

        C.      The Public Interest Factors Also Strongly Favor Dismissal................. 19

                1.      Indonesia's interest in deciding this dispute is significant while the
                        U.S. has, at most, a "mere passing interest." ............................ 20

                2.      There is no reason to burden this Court or a jury in Illinois with
                        resolving litigation in which they have no meaningful interest .............. 22

                3.      Dismissal would avoid unnecessary conflicts of law problems and
                        the necessity of applying Indonesian law ................................... 23

IV.     CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

Page

## Cases

*Alexander Proudfoot Plc v. Fed. Ins. Co.*, 860 F. Supp. 541 (N.D. Ill. 1994) ................................................................................................................. 18, 25

*Baumgart* v. *Fairchild Aircraft Corp.*, 981 F.2d 824 (5th Cir. 1993) .................... 12, 18

*Baumgart v. Fairchild Aircraft Corp.*, Civ. A. No. SA-90-CA-818, 1991 WL 487242 (W.D. Tex. Sept. 30, 1991), *aff'd*, 981 F.2d 824 (5th Cir. 1993) ......................................................................................................................... 23

*Boskoff v. The Boeing Co.*, 17 Avi. 18,613 (N.D. Ill. June 1, 1983) .......................... 22

*Carney v. Singapore Airlines*, 940 F. Supp. 1496 (D. Ariz. 1996)............................ 9, 16

*Cheng v. The Boeing Co.*, 708 F.2d 1406 (9th Cir. 1983) .............................................. 2

*Chhawchharia v. The Boeing Co.*, 657 F. Supp. 1157 (S.D.N.Y. 1987)................. 15, 20

*Compania Mexicana de Aviacion, S.A. v. U.S. District Court*, 859 F.2d 1354 (9th Cir. 1988)................................................................................................. 18

*Da Rocha v. Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318 (S.D. Fla. 2006) .............................................................................................................. passim

*Dahl v. United Techs. Corp.*, 632 F.2d 1027 (3d Cir. 1980) ...................................... 16

*Damigos v. Flanders Compania Naviera, S.A.-Panama*, 716 F. Supp. 104 (S.D.N.Y. 1989) ................................................................................................ passim

*De Aguilar v. The Boeing Co.*, 11 F.3d 55 (5th Cir. 1993)............................................. 2

*Esheva v. Siberia Airlines*, 499 F. Supp. 2d 493 (S.D.N.Y. 2007) ............... 2, 20, 21, 23

*Esser v. McIntyre*, 169 Ill. 2d 292 (1996) ................................................................... 24

*Gambra v. Int'l Lease Fin. Corp.*, 377 F. Supp. 2d 810 (C.D. Cal. 2005) .......... 2, 18, 20

*Gonzales v. P.T. Pelangi Niagra Mitra Int'l*, 196 F. Supp. 2d 482 (S.D. Tex. 2002)............................................................................................................... 9

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)...................................................... passim

*Helog Ag v. Kaman Aerospace Corp.*, 228 F. Supp. 2d 91 (D. Conn. 2002) .............. 23

*Holmgren v. Nat'l Big-4 Asbestos Removal Specialty, Inc.*, 228 Ill App. 3d 433 (1992) ....................................................................................................... 24

*Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*, 58 F. Supp. 2d 925 (N.D. Ill. 1999)....................................................................................................... 11

*In re Air Crash at Belle Harbor, New York on Nov. 12, 2001*, No. MDL 1448, 2006 WL 1288298 (S.D.N.Y. May 9, 2006) ................................................. 23

*In re Air Crash Disaster Near Chicago, Ill., on May 25, 1979*, 644 F.2d
594 (7th Cir. 1981) ........................................................................................... 24

*In re Air Crash Near Athens, Greece on Aug. 14, 2005*, 479 F. Supp. 2d
792 (N.D. Ill.), *appeal docketed*, No. 07-1707 (7th Cir. Mar. 29, 2007) ........................ passim

*In re Air Crash Over Taiwan Straits on May 25, 2002*, 331 F. Supp. 2d
1176 (C.D. Cal. 2004) ..................................................................................... passim

*In re Bridgestone/Firestone, Inc.*, 305 F. Supp. 2d 927 (S.D. Ind. 2004),
*vacated*, 420 F.3d 702 (7th Cir. 2005), *judgment reinstated*, 470 F.
Supp. 2d. 917 (S.D. Ind. 2006) ...................................................................... 16, 19

*In re Bridgestone/Firestone, Inc.*, 420 F.3d 702 (7th Cir. 2005) ....................................... 15, 20, 23

*In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F.
Supp 1141 (D.D.C. 1982) .................................................................................. 15

*In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*, 408 F.
Supp. 2d 569 (N.D. Ill. 2006), *aff'd*, 484 F.3d 951 (7th Cir. 2007) .................................. 21, 22

*In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951 (7th
Cir. 2007) ..................................................................................................... passim

*Kamel v. Hill-Rom Co.*, 108 F.3d at 799 (7th Cir. 1997) ............................................... passim

*Kryvicky v. Scandinavian Airlines Sys.*, 807 F.2d 514 (6th Cir. 1986) ............................. 2

*Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001) ........................................ 2, 13, 18, 22

*Macedo v. The Boeing Co.*, 693 F.2d 683 (7th Cir. 1982) ............................................ 22, 25

*McDonald's Corp. v. Bukele*, 960 F. Supp 1311 (N.D. Ill. 1997) ................................... 17, 22

*Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345 (1st Cir. 1992) ...................................... 11

*Nolan v. The Boeing Co.*, 762 F. Supp. 680 (E.D. La. 1989), *aff'd*, 919
F.2d 1058 (5th Cir. 1990) .................................................................................. 22

*Pain v. United Techs. Corp.*, 637 F.2d 775 (D.C. Cir. 1980) ....................................... 2, 16

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ................................................... passim

*PT Indopac Perdana Fin. v. Masagung*, Nos. 00-17345, 01-15622, 2002
WL 505915 (9th Cir. Apr. 1, 2002) ...................................................................... 9

*PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65 (2d Cir. 1998) ...................... 9, 11

*Pyrenee Ltd. v. Wocom Commodities, Ltd.*, 984 F. Supp. 1148 (N.D. Ill.
1997) ......................................................................................................... 17

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d
11 (1st Cir. 2004) ........................................................................................... 17

*Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140 (S.D.N.Y. 2004) ............................................ 19

*Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279 (11th Cir. 2001) ............................ 2, 16, 19, 25

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184
(2007) ..................................................................................................................................... 9

*Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842 (7th Cir. 1999) ..................................................... 24

*Tjontveit v. Den Norske Bank ASA*, 997 F. Supp. 799 (S.D. Tex. 1998) ............................... 10, 11

*Torreblanca De Aguilar v. The Boeing Co.*, 806 F. Supp. 139 (E.D. Tex.
1992), *aff'd*, 11 F.3d 55 (5th Cir. 1993) .................................................................................. 18

*U.S.O. Corp. v. Mizuho Holding Co.*, No. 06 C 0459, 2007 WL 2893628
(N.D. Ill. Sept. 27, 2007) ...................................................................................................... 16

*Van Schijndel v. The Boeing Co.*, 434 F. Supp. 2d 766 (C.D. Cal. 2006) ............................ passim

*Zermeno v. McDonnell Douglas Corp.*, 246 F. Supp. 2d 646 (S.D. Tex.
2003) ...................................................................................................................................... 18

*Zipfel v. Halliburton Co.*, 832 F.2d 1477 (9th Cir. 1987), *amended on
other grounds*, 861 F.2d 565 (9th Cir. 1988) ........................................................................... 9

**Statutes**

28 U.S.C. § 1603(b)(2) ................................................................................................................. 18

28 U.S.C. § 1604 .......................................................................................................................... 18

28 U.S.C. § 1605 .......................................................................................................................... 18

**Other Authorities**

Restatement (Second) of Conflict of Laws § 145(1) (1971)......................................................... 24

# TABLE OF SUPPORTING DECLARATIONS

(1)     Declaration of Richard Breuhaus in Support of the Motion to Dismiss on the Grounds of Forum Non Conveniens ("Breuhaus")

(2)     Declaration of Allison Kendrick in Support of Defendants' Joint Motion to Dismiss on the Grounds of Forum Non Conveniens ("Kendrick")

(3)     Statement from H. Priyatna Abdurrasyid in Support of Boeing Company's Motion for Dismissal on the Grounds of Forum Non Conveniens ("Priyatna")

(4)     Declaration from Todung Mulya Lubis in Support of Boeing Company's Motion for Dismissal on the Grounds of Forum Non Conveniens ("Lubis")

(5)     Declaration of Michael S. Bartron in Support of Defendants' Joint Motion to Dismiss on the Grounds of Forum Non Conveniens ("Bartron")

(6)     Declaration of William F. DeYoung in Support of Defendants' Joint Motion to Dismiss on the Grounds of Forum Non Conveniens ("DeYoung")

# I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendants The Boeing Company ("Boeing") and United Technologies Corporation ("UTC") (collectively, "Defendants") move on the ground of forum non conveniens ("FNC") to dismiss the claims of 186 plaintiffs arising from the crash of a domestic Indonesian flight operated by an Indonesian airline into a neighborhood adjacent to the Polonia Airport in Medan, Indonesia on September 5, 2005 (the "Accident").[1]  Plaintiffs seek to recover for wrongful death (152 plaintiffs), personal injury or loss of consortium (34 plaintiffs) and property damage (173 plaintiffs).  The overwhelming majority of plaintiffs (183 of 186) are citizens and residents of Indonesia, as were plaintiffs' decedents (60 of 64).  No plaintiff is, and no plaintiffs' decedent was, from Illinois or anywhere else in the United States.  All of the property allegedly damaged is or was in Indonesia.  In short, plaintiffs' claims are inextricably tied to Indonesia.  Both the private and public interest factors that the Court must consider in performing its FNC analysis overwhelmingly indicate that Indonesia is the appropriate forum in which to resolve these claims.

Of the 186 plaintiffs, 128 previously accepted compensation and were named as Releasors in written agreements signed in Indonesia settling their claims in full (the "Releases").  The settling plaintiffs expressly released their claims not only against the Indonesian air carrier, Mandala Airlines, but also against Boeing and UTC.  To the extent the settling plaintiffs contest the validity and enforceability of the Indonesian Releases, as they must in order for these claims to proceed, the private and public interest factors that inform the FNC analysis weigh heavily in favor of disputes regarding the Releases being resolved in Indonesia where the Releases were negotiated and signed and the compensation was paid.  The Releases themselves provide that the settlements are governed by Indonesian law and that all disputes regarding the settlements are to be resolved by an Indonesian District Court.  Furthermore, all of the witnesses and documents relating to the negotiation and execution of the Releases and the payment and receipt of the consideration for the Releases are located in Indonesia.  Not only is it more convenient and less costly for this evidence to be presented to an Indonesian court, but Boeing and UTC likely would be unable to compel the production of such evidence in the United States.  Under these

---

[1] This FNC motion and supporting memorandum applies to four consolidated cases: *Adiputra et al. v. Boeing et al.*, 1:07-cv-00250; *Justyantoro et al. v. Boeing et al.*, 1:07-cv-01387; *Zu et al. v. Boeing et al.*, 1:07-cv-04845; and *Adi et al. v .Boeing et al.*, 1:07-cv-04954.  Because these cases have been consolidated, this Memorandum will refer to a single "case."

circumstances, an Indonesian forum is by far the most convenient forum in which to resolve the issue of the Releases, which is potentially dispositive of the vast majority of these claims.

Aside from the Releases, this foreign aviation accident case fits squarely within the Supreme Court's controlling FNC decision of *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981), in which the Court applied FNC to dismiss claims brought by foreign plaintiffs against a U.S. aircraft manufacturer arising from a foreign aviation accident. Since *Piper Aircraft*, federal courts have repeatedly exercised their authority to dismiss claims arising from foreign aviation accidents that have little connection to the chosen forum.[2] Most recently, The Honorable George Lindberg of this district, following *Piper Aircraft* and its progeny, likewise exercised his discretion to dismiss on FNC grounds multidistrict litigation brought by Greek and Cypriot plaintiffs against Boeing arising out of the crash of a Cypriot 737 in Greece. *See In re Air Crash Near Athens, Greece on Aug. 14, 2005*, 479 F. Supp. 2d 792 (N.D. Ill.) ("*In re Athens*"), *appeal docketed*, No. 07-1707 (7th Cir. Mar. 29, 2007).

Like those prior cases, these predominantly Indonesian plaintiffs bring wrongful death and injury claims arising out of an accident involving a 24 year-old 737-200 operated and maintained by an Indonesian carrier on an intra-Indonesian flight. None of the plaintiffs, or the decedents for whom they bring suit, have any real connection to the U.S. In contrast, Indonesia is intricately connected to these actions. The Accident is being investigated by Indonesian governmental authorities. Initial reports indicate that the Mandala flight crew failed to properly configure the aircraft for takeoff and that the "slow" emergency response of the Indonesian company that operates the Polonia Airport, Angkasa Pura II, may have exacerbated the victims' injuries. Given these reports, Mandala's operations, maintenance, and flight crew training are especially critical from a liability standpoint. Similarly, Angkasa Pura II's emergency plan for the Polonia Airport (and the execution of that plan on the day of the Accident) is also critical. The only connection to the U.S. is that the commercial aircraft operations of Boeing are in

---

[2] *See, e.g., Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279 (11th Cir. 2001); *Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001); *De Aguilar v. The Boeing Co.*, 11 F.3d 55, 58-59 (5th Cir. 1993); *Kryvicky v. Scandinavian Airlines Sys.*, 807 F.2d 514 (6th Cir. 1986); *Cheng v. The Boeing Co.*, 708 F.2d 1406 (9th Cir. 1983); *Pain v. United Techs. Corp.*, 637 F.2d 775 (D.C. Cir. 1980); *Esheva v. Siberia Airlines*, 499 F. Supp. 2d 493 (S.D.N.Y. 2007); *Da Rocha v. Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318 (S.D. Fla. 2006); *Van Schijndel v. The Boeing Co.*, 434 F. Supp. 2d 766 (C.D. Cal. 2006); *Gambra v. Int'l Lease Fin. Corp.*, 377 F. Supp. 2d 810, 827 (C.D. Cal. 2005); *In re Air Crash Over Taiwan Straits on May 25, 2002*, 331 F. Supp. 2d 1176 (C.D. Cal. 2004).

Washington and that UTC operations are in Connecticut. There is no tie to Illinois other than the fact that more than 20 years after the accident airplane was delivered, Boeing moved its corporate headquarters there.

Thus, the official investigators, documents related to the investigation, the aircraft wreckage, and the records relating to Mandala and Angkasa Pura II are in Indonesia. Likewise, as plaintiffs have confirmed in their responses to FNC discovery, the overwhelming majority of damages evidence is also in Indonesia. In short, all of the liability and damages evidence is located outside of Illinois, and most of it is located outside the U.S. All of the Indonesian evidence is beyond this Court's compulsory process (and none of it is accessible, even through letters rogatory) and neither Mandala nor Angkasa Pura II can likely be joined in the U.S. Accordingly, the FNC private interest factors strongly favor Indonesia.

The public interest factors also favor Indonesia. Importantly, Indonesia has recently and concretely demonstrated its considerable interest in civil aviation safety. This Accident is but one in a series of Indonesian accidents during the last five years that prompted a wholesale governmental review of the civil aviation system and the safety of Indonesian air carriers. As a result, the Indonesian government, press, and public have demonstrated a palpable interest in the issues that will be raised in this litigation. Likewise, Indonesia has the greatest interest in promptly and adequately compensating for the losses caused by the accident. U.S. courts, in contrast, have merely a "passing interest" in this case. There is no rational reason to burden any U.S. court (let alone one in Illinois) with what would undoubtedly be long, complicated liability trials or separate damages cases arising from the claims made by these 186 plaintiffs.

This case, however, presents an even more compelling FNC argument than in *Piper Aircraft*, *In re Athens*, and the many other foreign aviation accident cases in which FNC has been granted. Standing alone, the Release issues distinguish this case and tip the balance of private and public interests more toward dismissal. The balance tips even further when considering that this case—unlike prior cases involving only wrongful death claims—involves claims for serious personal injury, disability, and lost earning potential. Such claims depend substantially on the credibility of plaintiffs' current and former heath care providers and employers who are all outside the U.S. The balance tips even further still given that all evidence related to the property damage claims is located abroad, too. The presence of these additional considerations—none of

which were present in combination in other recent foreign aviation accident cases dismissed on FNC grounds—decisively demonstrates that dismissal is warranted.

Indonesia is an adequate and available alternative forum in which to adjudicate plaintiffs' claims and the private and public interest factors weigh heavily in favor of dismissal. As conditions of dismissal, Defendants will agree to (1) consent to an Indonesian court's jurisdiction in actions refiled by these plaintiffs; (2) toll any statute of limitations that might apply to such refiled claims for 120 days after dismissal by this Court; (3) make available in actions refiled by these plaintiffs in the courts of Indonesia any evidence or witnesses in their possession, custody, or control in the U.S. that the Indonesian court deem relevant, and (4) pay or cause to be paid any final, post-appeal judgment awarded against Defendants by an Indonesian court in such refiled actions. Kendrick ¶ 18; DeYoung ¶ 2.[3]

## II.    BACKGROUND

### A.    The Accident and Resulting Investigation.

On September 5, 2005, Mandala Airlines Flight 91 crashed on takeoff at Polonia Airport in Medan, Indonesia. Breuhaus ¶ 3. Flight 91 was headed to Jakarta on a domestic flight. *Id.* As the aircraft attempted to take off at Medan it failed to become fully airborne, crashed into approach lights at the end of the runway, crossed a busy street adjacent to the airport, and landed in a neighborhood near the airport. The aircraft then caught fire. It reportedly took airport rescue and firefighting teams nearly 30 minutes to reach the accident site and begin firefighting and rescue operations. Priyatna ¶ 2; Kendrick Ex. G.

Of the 117 people on board Flight 91, 100 were killed and 15 were injured. 49 people on the ground were also killed and 26 were injured. Priyatna ¶ 2. None of those killed or injured were from the U.S.; the vast majority (including the flight and cabin crew) were Indonesian citizens or residents. Kendrick ¶ 13(e)-(i); Priyatna ¶ 2. The Accident caused substantial property damage in the neighborhood adjacent to the airport. Priyatna ¶ 2; Kendrick Ex. G.

Mandala is a domestic Indonesian airline. It operates and maintains its aircraft in Indonesia. Breuhaus ¶ 6. It does not operate flights outside Indonesian territory, and has never operated flights to the U.S. *Id.*; Kendrick Ex. C. Mandala's headquarters and base of

---

[3] Boeing and UTC have entered into a "Joint Defense, Sharing, and Indemnity Agreement" that relates to these claims, which will not in any way prejudice the plaintiffs' rights to a recovery if this case is transferred.

maintenance operations are located in Jakarta. Breuhaus ¶¶ 6, 12; Kendrick Ex. C. The accident aircraft was a 24-year-old Boeing model 737-200 aircraft equipped with two Pratt & Whitney model JT8D engines.[4] Breuhaus ¶ 4; Bartron ¶ 7. Boeing originally delivered the accident aircraft to its first owner in 1981; Mandala purchased the aircraft from its first owner in 1994. Breuhaus ¶ 4. The engines were originally installed on aircraft in 1970 and 1981, respectively. Bartron ¶ 7. The accident aircraft was registered in Indonesia and was inspected and certified as airworthy by the Indonesian Directorate of Civil Aviation ("DGAC"). Breuhaus ¶ 4. The DGAC has oversight responsibilities for the operations of Mandala, the qualifications and training of Mandala flight crews, and the airworthiness of Mandala aircraft. *Id.* ¶¶ 4-6.

The Polonia Airport is operated by a company called Angkasa Pura II, which is wholly owned by the Indonesian government. Breuhaus ¶ 8. Angkasa Pura II is responsible for the operation of ten Indonesian airports, including the proper preparation for, and response to, accidents at these airports or in their immediate vicinity. *See id.* ¶¶ 8, 12, 14(d); Priyatna ¶ 16 & Ex. C at 31. As with Mandala, the Indonesian DGAC has oversight duties for Angkasa Pura II. Priyatna ¶ 27.

Because the Accident occurred in Indonesia, that country's National Transportation Security Committee (or "KNKT" in Indonesia) is responsible for conducting the official accident investigation. Wreckage recovered during the investigation is located in Indonesia and is in the KNKT's possession, as are the official records of the investigation and the individuals who are responsible for and leading the investigation. Breuhaus ¶¶ 9-12, 14(a), (b); Bartron ¶ 16. A representative from the United States National Transportation Safety Board ("NTSB") is participating in the investigation. Boeing and UTC serve as technical advisors to this representative and have provided limited technical assistance to the investigation solely when requested by the KNKT or NTSB. Breuhaus ¶¶ 10, 11, 13; Bartron ¶¶ 5, 9-12, 15. Neither the NTSB, Boeing, or UTC have been involved in every aspect of the Indonesian government's investigation. And while, as is typical in such investigations, limited and discrete activities have occurred in the U.S., most investigation activities were conducted in Indonesia. Breuhaus ¶¶ 12-14; Bartron ¶ 15.

---

[4] Pratt & Whitney is an unincorporated division of United Technologies Corporation that designs and manufactures aircraft engines. *See* Bartron ¶¶ 2, 7.

The Indonesian authorities have not released a final report from their investigation. Breuhaus ¶ 9. Nevertheless, it appears from public reports that both Mandala Airlines and Angkasa Pura II may bear fault for the Accident or the resulting deaths and injuries. It has been reported that the flight crew failed to properly set the flaps and correctly configure the aircraft for takeoff. Priyatna ¶ 2; Kendrick Ex. G. Angkasa Pura II has been faulted for its "slow" emergency response which increased the number of fatalities. Kendrick Ex. H at 31.

## B.    Indonesian Civil Aviation.

The Mandala Accident was only one in a series of serious Indonesian aviation and other transportation accidents that have occurred over the last five years. These accidents have called into question the safety of the Indonesian civil aviation system, especially after the European Union put all Indonesian air carriers on its "blacklist" and the U.S. Federal Aviation Administration advised U.S. citizens not to fly on Indonesian airlines. Priyatna ¶ 21 & Exs. C, E-H). These events prompted the Indonesian government to take steps to evaluate and improve Indonesian civil aviation safety. The President of Indonesia has formed a committee called the National Transportation Safety and Security Evaluation Team (or "EKKT" in Indonesian) to evaluate the Indonesian national transportation infrastructure and implement policies for improving civil aviation safety and security. Priyatna ¶¶ 10, 17-18. The EKKT has already proposed a nine-point plan for improvement. *Id.* ¶ 18. The Indonesian Ministry of Transportation has audited and ranked the safety of all Indonesian airlines and required low-rated airlines to make improvements. *Id.* ¶ 24. And the Indonesian government has signed a joint agreement with the International Civil Aviation Organization to improve civil aviation safety in the country. *Id.* ¶ 26. Given the importance of aviation to Indonesia's transportation system, which must connect 17,500 islands spread over 1.9 million square kilometers, the Indonesian press and the Indonesian public have demonstrated a high level of interest in their government's efforts to improve, and the resulting state of, civil aviation safety. *See, e.g.*, Priyatna ¶¶ 12, 19, 20 & Ex. C (Tempo Magazine issue entitled "Grounded! Flying on Empty" that includes articles entitled "Indonesia's Flying Circus" and "Danger in the Skies, Hazards on the Ground.").

## C.    The Flight 91 Claims History and Litigation.

Almost immediately after the Accident, Mandala and its insurers compensated most of the victims and/or their families. 128 of the 186 plaintiffs here are named as "Releasors" in such settlements. Kendrick ¶ 4. Mandala paid compensation ranging from 33,000,000 to 300,000,000

Indonesian Rupiahs in personal injury cases and 300,000,000 Indonesian Rupiahs in wrongful death cases. Kendrick ¶¶ 4, 5. In exchange for this compensation, plaintiffs released their claims against not only Mandala, but also against Boeing and UTC. The Releases specifically identify Boeing and UTC[5] as released parties. Kendrick Exs. A, B; Lubis ¶ 53 & Ex. B. All but two of the Releases were negotiated between Mandala representatives and the victims or their family members in Indonesia, executed in Indonesia, and witnessed by Indonesian witnesses and/or notaries. None was negotiated or executed in the U.S. Kendrick Ex. C; Lubis ¶ 55. Because these claims are "most closely connected to Indonesia," the Releases contain a choice-of-law clause selecting Indonesian law as the governing law. Kendrick Ex. C. They also contain a choice-of-forum clause that selects an Indonesian District Court as the only forum that can resolve "any disputes arising out of or based on or in connection with" the Releases. *Id.*; Lubis ¶ 59. The Releases are irrevocable and were intended to release completely Boeing and UTC from liability arising out of the Accident. Kendrick Ex. C; Lubis ¶ 53. The Releases are enforceable under Indonesian law. Lubis ¶ 57.

Notwithstanding the Releases, four multi-plaintiff lawsuits arising out of the Accident have been filed in the Northern District of Illinois. A total of 152 plaintiffs bring wrongful death actions for 64 decedents' estates. Kendrick ¶ 13(a). 149 of these wrongful death plaintiffs and 60 of the decedents are or were citizens and residents of Indonesia.[6] *Id.* ¶ 13(f), (h). All 34 plaintiffs bringing personal injury or consortium claims are Indonesian citizens and residents. *Id.* ¶ 13(e). No plaintiff or decedent is or was a U.S. citizen or resident. *Id.* ¶ 13(i).

In their U.S. complaints, the plaintiffs generally assert product liability and negligence claims against Defendants. None of the plaintiffs can identify with particularity a defect in the airplane or its engines that caused the accident. At most, some plaintiffs generically allege that there were "defects in the engines, flaps, and warning systems of the subject aircraft," negligent

---

[5] The Releases actually name Pratt & Whitney and its "affiliates" as "Releasees." UTC is an "affiliate" of Pratt & Whitney. Bartron ¶ 2.

[6] The three non-Indonesian plaintiffs are citizens and residents of the People's Republic of China. Kendrick ¶ 13(f). Of the remaining four decedents, one resided in South Korea, but was a citizen of Indonesia; one was a citizen and resident of Japan; and two were residents and citizens of China. Further, plaintiffs have identified 190 family members, heirs, and survivors of the decedents who seek damages. 184 of these are Indonesian citizens and residents. Of the remaining alleged beneficiaries, one is a resident of Indonesia and a citizen of Japan; one is a resident of Singapore but citizen of Indonesia; and four are citizens and residents of China. *Id.* ¶ 13(g).

instructions for "maintenance, repair, and operations," and that the "engines did not provide sufficient lift to takeoff under all reasonably foreseeable conditions." *See* Adiputra Second Amended Complaint at Count I, ¶ 10, Count VII, ¶ 10; Adi Complaint at Count II, ¶ 11. The rest of the plaintiffs are even more vague in their assertions. *See* Justyantoro Second Amended Complaint at Count I, ¶ 12, Count IX, ¶ 13 (both alleging only that the aircraft and its engines were "defective, unreasonably dangerous, and/or unfit for [their] intended use.").

Notwithstanding the vagueness of these allegations, no possibly relevant evidence in Defendants' possession is located in Illinois. Boeing and UTC are corporations organized and existing under the laws of the State of Delaware. Kendrick Ex. J; Bartron ¶ 2. Although Boeing moved its world-wide headquarters to Chicago, Illinois in 2001 (20 years after it delivered the accident aircraft), its Commercial Airplanes division is headquartered in Washington. *See* Breuhaus ¶ 14(g), (h). The accident aircraft was assembled in Washington and any relevant documents are located there, too. *Id.* ¶ 14(g). UTC's headquarters (as well as that of its Pratt & Whitney division) is located in Connecticut. Bartron ¶ 2. The two engines on the accident aircraft were manufactured in 1969 and 1981, respectively. They were used by other operators until they came into Mandala's possession in approximately 1994 for one, and 2002 or 2003 for the other. Bartron ¶ 7. All documents in UTC's possession that are relevant to the design and manufacture of these engines are located in or near Connecticut. *Id.* ¶ 17.

Consistent with reported causes of the Accident, Boeing has plead in its Answers and Affirmative Defenses that Mandala and Angkasa Pura II caused or contributed to the Accident and subsequent injuries and thus their conduct is squarely at issue. *See, e.g.,* Answer and Affirmative Defenses to Amended Complaint and Jury Demand by Defendant The Boeing Company at 37, 38 (Second, Fourth, Fifth Defenses), filed in *Justyantoro et al. v. The Boeing Company, et al.*, Case No. 1:07-CV-1387. Since these entities, as well as their regulatory agency (the DGAC) are located in Indonesia, essential records and witnesses relevant to the Accident and this litigation are located in Indonesia. *See* Breuhaus ¶¶ 6, 8, 12, 14; Bartron ¶ 16.

### III.   ARGUMENT

The cornerstone of the FNC analysis is convenience. "[A] trial court may dismiss a suit over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice." *Kamel v. Hill-Rom Co.*, 108 F.3d at 799 (7th Cir. 1997). Specifically, an FNC dismissal is appropriate if there is an adequate alternative forum in which the case may be

tried and the relevant private and public interest factors favor dismissal. *See id.* In balancing these factors, plaintiffs' choice of a U.S. forum is entitled to little deference. This is so because when foreign plaintiffs bring suit in the U.S., their choice of forum cannot be presumed to be based on convenience. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007); *Piper Aircraft*, 454 U.S. at 256; *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951, 955-56 (7th Cir. 2007) ("*In re Factor II*"). As shown below, Indonesia is an available and adequate alternative forum for this litigation and—as in *Piper Aircraft*, *In re Athens*, and their progeny—the public and private interest factors overwhelmingly favor dismissal.

## A. Indonesia Is an Available and Adequate Alternative Forum.

The first step in the FNC analysis is to determine whether an adequate alternative forum is available. "This is a two part inquiry: availability and adequacy." *Kamel*, 108 F.3d at 802. Courts have consistently held that Indonesia is an available and adequate alternative forum for personal injury and wrongful death cases. *See, e.g., Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1484-85 (9th Cir. 1987), *amended on other grounds*, 861 F.2d 565 (9th Cir. 1988); *Gonzales v. P.T. Pelangi Niagra Mitra Int'l*, 196 F. Supp. 2d 482, 486-89 (S.D. Tex. 2002); *Carney v. Singapore Airlines*, 940 F. Supp. 1496, 1499-1501 (D. Ariz. 1996).[7] No reason exists to reach a different conclusion here.

The conclusion that Indonesia is an available and adequate alternative forum is confirmed by the declarations of Todung Mulya Lubis and Priyatna Abdurrasyid, two Indonesian law experts. Lubis has more than 30 years experience practicing law in Indonesia; regularly serves as counsel for large multinational and Indonesian corporations in Indonesian courts at all levels; and is a lecturer in the faculty of law at several Indonesian universities. Lubis ¶¶ 3-5. Priyatna is an Air and Space Law expert with extensive experience lecturing in law at Indonesian universities and advising governmental entities on issues related to aviation law and regulation. Priyatna ¶¶ 5-9. He is the sole legal expert appointed by the President of Indonesia to the EKKT and is thus uniquely qualified to address matters of current aviation law in Indonesia. *Id.* ¶ 17. Priyatna also regularly provides training to Indonesian judges. *Id.* ¶ 7. These experts unequivocally confirm the availability and adequacy of Indonesia.

---

[7] *See also PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74-75 (2d Cir. 1998) (Indonesia adequate in action for breach of contract and fiduciary duty and fraud); *PT Indopac Perdana Fin. v. Masagung*, Nos. 00-17345, 01-15622, 2002 WL 505915 (9th Cir. Apr. 1, 2002) (Indonesia adequate in action related to loan guarantee).

### 1. Indonesia is an available forum.

A forum is available where all parties are amenable to process and within the forum's jurisdiction. *Kamel*, 108 F.3d at 803. Here, Defendants are subject to the jurisdiction of Indonesian courts because the accident occurred in Indonesia. Lubis ¶ 33. Indonesia's availability is further assured because Defendants have consented to accept jurisdiction there as a condition of dismissal. *Id.* ¶ 34 (Indonesian courts will accept foreign defendants' consent to accept jurisdiction). This consent, alone, establishes Indonesia's availability. *See In re Factor II*, 484 F.3d at 957; *Kamel*, 108 F.3d at 803.

Not only is Indonesia an available forum, for most of these plaintiffs' claims it is a mandatory forum. Because 126 of these plaintiffs previously released their claims against Boeing and UTC, their actions are barred unless they challenge the validity of the Releases. But these plaintiffs have previously agreed, through the Releases' Indonesian choice-of-forum clause, to litigate issues related to the Releases' validity only in an Indonesian District Court. Kendrick Exs. A-C; Lubis ¶ 59. This forum selection clause is enforceable. Lubis ¶¶ 57, 59. At least with respect to those plaintiffs who are also "Releasors," therefore, FNC should be granted to effectuate the terms of their contractual forum selection. *See Tjontveit v. Den Norske Bank ASA*, 997 F. Supp. 799, 805 (S.D. Tex. 1998) ("A forum selection clause is presumably valid and creates a strong presumption favoring venue in the agreed-upon forum."); *see also Damigos v. Flanders Compania Naviera, S.A.-Panama*, 716 F. Supp. 104, 106-07 (S.D.N.Y. 1989) (forum selection clause in Greek release should be enforced).[8]

### 2. Indonesia is an adequate forum.

"An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly." *Kamel*, 108 F.3d at 803. Indonesia easily satisfies this low threshold requirement. Plaintiffs will not be deprived of "all" remedies in Indonesia. The Indonesian Civil Code provides victims a cause of action for "wrongful acts." This is similar (although not identical) to a common law negligence claim. Lubis ¶¶ 48-52. Certain economic and non-economic damages are available to surviving spouses, children and parents who would have received financial support from a decedent. *Id.* As to any claims that are not otherwise barred by the Releases, Lubis states that: "If the plaintiffs demonstrate that Boeing and UTC committed

---

[8] Given their prior selection of an Indonesian forum to settle such disputes, these plaintiffs cannot now question the adequacy of the Indonesian forum either.

'wrongful acts' which caused the Mandala plane crash, the Indonesian courts can and will decide to provide damages and compensation to the plaintiffs." *Id.* ¶ 63. Because Indonesia provides plaintiffs "some potential avenue for redress" it is an adequate forum. *Kamel*, 108 F.3d at 803 (internal quotations and citation omitted); *see also Piper Aircraft*, 454 U.S. at 254 & n.22.

Further, as demonstrated in the Lubis and Priyatna Declarations, Indonesia's judicial system contains sufficient procedural safeguards. The Indonesian judicial system is a civil law judicial system based on the European model. Lubis ¶ 12. Plaintiffs would have easy access to Indonesian counsel and, indeed, many already have relationships with Indonesian counsel. Lubis ¶ 40; Kendrick ¶ 13(r). After paying minimal filing fees, plaintiffs could file their cases in a District Court. Lubis ¶¶ 22, 27, 41. The cases would be decided by a panel of three judges who must be qualified, trained, and approved by the Chief Justice of the Supreme Court and/or President of Indonesia. *Id.* ¶¶ 16, 22, 27. Indonesian procedural rules provide for the collection of evidence (both documentary and testimonial) from parties and Indonesian third parties, as well as for the presentation of such evidence (including expert testimony) in court for examination by the judges and opposing counsel. *Id.* ¶¶ 43-45. Two levels of appeals are available. *Id.* at ¶ 23-25. Final judgments are enforceable. *Id.* ¶ 26. Although the procedures of the Indonesian courts differ from those in U.S. proceedings, that does not make the forum inadequate. *See Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*, 58 F. Supp. 2d 925, 929 (N.D. Ill. 1999) (citing *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1352-53 (1st Cir. 1992)).

As the standard for adequacy is "easily met," *In re Athens*, 479 F. Supp. 2d at 797, this is not one of those "rare" situations in which the alternative forum may be deemed inadequate. *See PT United Can*, 138 F.3d at 73 ("At this stage, considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards, so such a finding is rare.") (citation omitted).[9] Both Lubis and Priyatna underscore that not only is Indonesia an adequate forum for this litigation, it is the preferable forum. This litigation would be followed closely by the Indonesian government, press, and

---

[9] Further, as an example of the adequate functioning of the Indonesian court system, at least one plaintiff in a U.S. case filed claims there relating to the Accident. Plaintiff Lim A. Siong (who brings a wrongful death action in the U.S. for the death of his brother Sui Liong) previously filed suit in Medan District Court on his own behalf and for his six siblings against Sui Liong's widow to resolve questions of inheritance and distribution of Sui Liong's assets and the settlement proceeds paid by Mandala. *See* Kendrick ¶¶ 8, 9 & Ex. E; *Tjontveit*, 997 F. Supp. at 804-06 (fact that plaintiff had instituted legal proceedings in the foreign forum was relevant to adequacy determination).

public; and the high profile nature of this litigation would facilitate the proper, efficient, and fair resolution of these claims. Priyatna ¶¶ 12, 27-29; Lubis ¶¶ 62, 63.

**B.      The Private Interest Factors Strongly Favor Dismissal.**

The private interest factors include the relative ease of access to sources of proof, availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining attendance of willing witnesses, the possibility of viewing the Accident site, and "'all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Here, the private interest factors weigh heavily in favor of FNC dismissal.

**1.      The ease of access to sources of proof factor favors Indonesia.**

The majority of witnesses, documentary evidence, and physical evidence relating to the Releases, liability, and damages are located in Indonesia. Plaintiffs and their decedents—the overwhelming majority of whom are or were Indonesian—were injured or killed when an aircraft that had been maintained, inspected, and operated by Mandala, an Indonesian carrier, crashed near an Indonesian airport during a scheduled flight between two Indonesian cities. Most of these plaintiffs received compensation and executed Releases in Indonesia that relieved Boeing and UTC from further liability. Plainly, documents in Indonesia and the testimony of Indonesian witnesses will be of critical significance to this case. *See Baumgart* v. *Fairchild Aircraft Corp.*, 981 F.2d 824, 836-37 (5th Cir. 1993) (affirming FNC dismissal of action where, among other things, most of the evidence was located in Germany); *see Da Rocha*, 451 F. Supp. 2d at 1323-24.

**a.      Evidence regarding the Releases is in Indonesia.**

Evidence regarding the Releases (and the circumstances surrounding their negotiation and execution) will be necessary if 126 of these plaintiffs continue to pursue their previously released claims against Defendants. This evidence includes documents and witnesses relating to the settlement negotiations, execution of the Releases, and tender of the settlement funds. Of critical importance will be evidence from Mandala representatives who drafted and negotiated the Releases and paid the settlement funds. Similarly, the witnesses to the Releases and Indonesian notaries who verified plaintiffs' signatures will be important. Because all but two of these Releases were executed in Indonesia,[10] essentially all necessary sources of proof relevant to

------------------

[10] Two Releases were executed in China. Kendrick Ex. C.

the Release issues are in Indonesia. *See* Kendrick Ex. C; Lubis ¶¶ 55, 58, 59. None is in the U.S. This factor favors dismissal. *See Damigos*, 716 F. Supp. at 107-08.

  **b.**  **Critical liability evidence is in Indonesia.**

  As outlined above, the Indonesian KNKT is leading the investigation into this loss of an Indonesian aircraft on takeoff from an Indonesian airport. As a result, much of the liability evidence relating to the Accident's probable cause is located there. While a detailed list of relevant documents and witnesses is not required, *see Piper Aircraft*, 454 U.S. at 267, the following non-exhaustive description of liability evidence located solely in Indonesia suffices to demonstrate that access to evidence would be easier there.[11]

  **Witnesses and Records of the KNKT investigation and the wreckage assembled by the investigators.** The KNKT is a central source of evidence needed to determine the cause of the Accident. The KNKT has likely gathered and evaluated significant documentary and testimonial evidence from a variety of Indonesian sources in order to prepare its report on the Accident's cause. Breuhaus ¶ 12 (identifying evidence likely collected by the KNKT). In addition, while plaintiffs give no details in their Complaints to identify specific defects in the aircraft, the very systems many of them complain about (including the engine, the flight control surfaces, and flaps and associated hardware) are in the KNKT's possession, as is all other recovered wreckage. Breuhaus ¶¶ 14(a), (b); *see Da Rocha*, 451 F. Supp. 2d at 1323; *Taiwan Straits*, 331 F. Supp. 2d at 1196 (both noting the location of wreckage as significant in FNC analysis). This physical wreckage is likely the best source of primary evidence to establish the Accident's cause. Because the KNKT conducted significant portions of its investigation in Indonesia without participation by the NTSB, Boeing, or UTC, access to KNKT witnesses and records is critical to assembling the evidence necessary to prove the facts relevant to the cause of the Accident. *See Lueck*, 236 F.3d at 1146 ("New Zealand evidence relating to the accident is essential to this suit . . . ."); Breuhaus ¶¶ 12, 14(a).

  **Witnesses and Records of Mandala.** Mandala is also a critical source of evidence. At the very least, reports raise as an issue whether (and why) the flight crew failed to properly configure the aircraft for takeoff. Mandala has relevant evidence on this issue which is undoubtedly located in Indonesia. *See* Breuhaus ¶ 14(c); *see also* Priyatna ¶ 15. This includes evidence on: (i) Mandala's flight operating procedures, including those regarding configuration

---

[11] Other evidence is also in Indonesia. *See* Breuhaus ¶¶ 12, 14(a)-(e); Bartron ¶¶ 13-14, 16.

of the aircraft for takeoff; (ii) the operating manuals available to the flight crew and whether they were approved by the DGAC; (iii) the qualifications and experience of the flight crew; and (iv) the training that the flight crew received from Mandala, especially regarding Mandala's operating procedures, and reviews of the flight crew's performance of and adherence to such procedures. *See* Breuhaus ¶ 14(c).

Mandala also has evidence relevant to evaluating plaintiffs' generic allegations regarding the aircraft's engines, flaps, and warning systems. For example, evidence regarding Mandala's maintenance on the accident aircraft would shed light on whether Mandala had properly maintained in good working order the aircraft's engines, flaps, and warning systems. *See Van Schijndel*, 434 F. Supp. 2d at 777 (noting that "[i]n a products liability case . . . maintenance records may well be crucial" and granting FNC).

Finally, evidence of the procedures that Mandala and its personnel followed for maintaining, repairing, and operating the aircraft are particularly critical given that some plaintiffs allege that Boeing failed to advise Mandala of proper maintenance, repair, and operating procedures. *See* Adi Complaint at Count II, ¶ 11. These claims would fail on causation grounds, however, if it could be shown that Mandala never acquired or ignored recommendations from Boeing regarding maintenance, repair, and operation of the aircraft. All evidence of Mandala's procedures is in Indonesia. Breuhaus ¶ 14(c).

**Witnesses and records of Angkasa Pura II**. The Angkasa Pura II employees who participated in and were responsible for the Accident firefighting and rescue operations are key witnesses. These individuals, all of whom work(ed) at an Indonesian airport, can explain the delay in reaching the Accident site; what they saw when they arrived at the site; whether their efforts complied with the Polonia Airport Emergency Plan; and, if so, whether that emergency plan conformed with Indonesian law and international norms. *See* Breuhaus ¶ 12; *see also* Priyatna ¶ 16. This testimony is needed to determine whether the acts of Angkasa Pura II exacerbated the plaintiffs' injuries, as has been previously reported.

**Witnesses and records of DGAC regulation of the aircraft, airline, flight crew, and airport operator.** The DGAC inspected and certified the aircraft as airworthy regularly in the eleven years that it was operated by Mandala. Breuhaus ¶¶ 4, 5. The DGAC also regulated the flight crew, the airport operator, and the airline. *Id.* ¶¶ 5, 6, 12; Priyatna ¶ 27. This evidence in Indonesia points toward dismissal. *In re Athens*, 479 F. Supp. 2d at 800 (finding that ease of

access to evidence favors Cyprus or Greece and noting that "records and witnesses relating to the Cyprus Department of Civil Aviation's oversight of Helios's operations are located in Cyprus").

### c. Damages evidence is in Indonesia.

Indonesia is or was the home forum for almost all of the plaintiffs, wrongful death beneficiaries, and decedents in this case. Kendrick ¶ 13(a)-(i). Plaintiffs' responses to Boeing's discovery requests confirm that damages evidence is overwhelmingly found in Indonesia, with a small amount in other Asian countries. *Id.* ¶ 13(d), (j)-(q).[12] For the wrongful death and personal injury claims at issue here, the relevant evidence in Indonesia includes: (i) the documents and witnesses necessary to evaluate plaintiffs' and the wrongful death beneficiaries' financial losses (including tax returns, bank records, pay stubs, employment records, and documents relating to funeral, mortuary or burial expenses); (ii) documents and witnesses relevant to the personal injury plaintiffs' and decedents' pre- and post-accident medical condition and life expectancies (e.g., doctors and other health care providers and their records); and (iii) documents and witnesses relevant to the intangible losses suffered by the loss of consortium plaintiffs, the personal injury plaintiffs and the decedent's families.[13] Kendrick ¶ 13(j)-(q). If damages issues (as well as Release issues) are allowed to proceed in this Court, nearly all of the relevant documents and testimony will require translation into English, with the accompanying delay, cost, and potential for mistakes.

In suits arising from the injuries and/or deaths of foreign domiciliaries, courts have consistently held that the ease of access to sources of damages proof in the plaintiff's or decedent's home forum weighs heavily for dismissal. *See Chhawchharia v. The Boeing Co.*, 657 F. Supp. 1157, 1161 (S.D.N.Y. 1987); *In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp 1141, 1147 (D.D.C. 1982). In an analogous foreign aviation accident case involving over 100 foreign decedents, the court recognized that the voluminous amount of damages evidence in the foreign forum, *standing alone*, made the overall ease of access to evidence greater abroad. *Taiwan Straits*, 331 F. Supp. 2d at 1196; *see also In re Bridgestone/ Firestone, Inc.*, 420 F.3d 702, 705 (7th Cir. 2005) ("*In re Bridgestone/Firestone II*"). No different conclusion is warranted here.

---

[12] One decedent was apparently employed by a U.S. company and may have employment records in the U.S. However, that decedent (a doctor) lived and worked in Indonesia. Kendrick ¶ 13(n).

[13] 173 plaintiffs also seek compensation for property damges. They admit that all records relevant to these claims are outside the U.S.; most are in Indonesia, but some are in China. Kendrick ¶ 13(d).

In sum, the "access to sources of proof" private interest factor plainly favors dismissal. Essentially all of the Release and damages evidence is located in Indonesia. So, too, is much of the critical liability evidence. Courts confronted with cases like this one, where evidence pertaining to the cause of foreign aviation accidents and the resulting damages is located abroad, have considered this to be a strong factor favoring FNC dismissal. This case is no different. *See Satz*, 244 F.3d at 1283-84; *In re Athens*, 479 F. Supp. 2d at 800; *Da Rocha*, 451 F. Supp. 2d at 1323-24; *Van Schijndel*, 434 F. Supp. 2d at 776-77; *see also Kamel*, 108 F.3d at 804; *In re Bridgestone/Firestone, Inc.*, 305 F. Supp. 927, 937 (S.D. Ind. 2004) ("*In re Bridgestone/Firestone I*"), *vacated*, 420 F.3d 702 (7th Cir. 2005), *judgment reinstated*, 470 F. Supp. 2d. 917 (S.D. Ind. 2006).

## 2. Many critical witnesses are beyond the reach of compulsory process.

The Supreme Court in *Gulf Oil* recognized the importance of choosing a forum where unwilling witnesses can be compelled to appear and testify. 330 U.S. at 511. In this case, all of the critical evidence relating to the Releases and damages, as well as many critical witnesses relating to liability, are beyond this Court's compulsory process. *Carney*, 940 F. Supp. at 1502-03. All of this Indonesian evidence, however, would be available were this case refiled there. Indonesian law provides mechanisms to compel production of documents from parties and non-parties and to obtain the testimony of witnesses. Lubis ¶¶ 44, 45. This is a significant factor in the FNC analysis. *Pain*, 637 F.2d at 787; *Dahl v. United Techs. Corp.*, 632 F.2d 1027, 1030 (3d Cir. 1980); *Carney*, 940 F. Supp. at 1503.

Compounding the prejudice caused by this lack of compulsory process, Indonesian courts will likely ignore any request from this Court for judicial assistance to compel evidence in Indonesia. Indonesia recognizes no treaty that facilitates the collection of evidence from non-parties in Indonesia. *See* Lubis ¶ 46.[14] A party in the U.S. may try to obtain evidence in Indonesia through a letter rogatory. But no Indonesian law facilitates the execution of a letter rogatory and Indonesian courts generally do not respond to them. Lubis ¶ 46 (giving example of Indonesian court ignoring U.S. letter rogatory). The likelihood that such a request would be

---

[14] Some courts have found that the availability of such treaties (*e.g.*, the Hague Convention) cures in whole or in part the U.S. court's lack of compulsory process over foreign witnesses and documents. However, the unavailability of such a treaty coupled with the dismal prospects for letters rogatory in Indonesia distinguish those cases and tips this factor in favor of dismissal. *See U.S.O. Corp. v. Mizuho Holding Co.*, No. 06 C 0459, 2007 WL 2893628, at *5 (N.D. Ill. Sept. 27, 2007).

enforced in Indonesia is "miniscule." *Id.*; *see Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 21 & n.4 (1st Cir. 2004) (obtaining evidence through letters rogatory is "burdensome, costly, and time-consuming," and less certain than under the Hague Convention).

Therefore, if this case remains in Illinois, Defendants will be unable to compel the production of documents, attendance at trial, or even the appearance at a deposition of third-party witnesses regarding Release issues, liability, or damages. *See infra* section III.B.1 (identifying the third-party Release, liability, and damages witnesses). With respect to the Release issues, the lack of compulsory process would be particularly prejudicial. Without compulsory process, Defendants have no way to obtain any testimony or documents from the *only* witnesses (all of whom are in Indonesia) whose testimony might contradict evidence that plaintiffs may offer (including their own declarations and declarations of friendly witnesses such as family members) to attack the Releases' validity.[15] This strongly favors dismissal. *Van Schijndel*, 434 F. Supp. 2d at 779 ("[C]ourts continue to affirm that it is not fair to make U.S. manufacturers proceed to trial without foreign witnesses who cannot be compelled to attend."); *Damigos*, 716 F. Supp. at 107 (FNC granted in favor of Greece noting that the "attorneys who negotiated the releases in the Greek action reside and work in Greece").

Voluntary production of Indonesian evidence will not substitute for the lack of compulsory process. At the very least, Mandala has flatly refused to produce voluntarily its documents in the U.S. or permit its witnesses to testify for a U.S. trial. Kendrick Ex. C. No reason exists to believe that other Indonesian third parties would take a different position. Even if they did, it would still be far less burdensome and expensive for those voluntary witnesses to appear in Indonesia rather than Illinois. This, too, favors dismissal. *See Da Rocha*, 451 F. Supp. 2d at 1324; *Pyrenee Ltd. v. Wocom Commodities, Ltd.*, 984 F. Supp. 1148, 1165 (N.D. Ill. 1997); *McDonald's Corp. v. Bukele*, 960 F. Supp 1311, 1318-19 (N.D. Ill. 1997).

### 3. In contrast, all relevant evidence in Defendants' control is outside Illinois and will be available in Indonesia.

That Boeing and UTC have evidence in the U.S. does not outweigh the factors that favor Indonesia. Plaintiffs will have access to Defendants' evidence in an Indonesian action. First,

---

[15] Defendants would similarly be prejudiced in their inability to compel evidence from Mandala, Angkasa Pura II, the DGAC, and the KNKT to demonstrate their defense that Mandala and Angkasa Pura II caused in whole or in part the Accident and resulting injuries.

witnesses and documents within Defendants' control will be subject to the compulsory process of the Indonesian court. Lubis ¶ 45; *In re Athens*, 479 F. Supp. 2d at 801; *Alexander Proudfoot Plc v. Fed. Ins. Co.*, 860 F. Supp. 541, 545 (N.D. Ill. 1994); *see Lueck*, 236 F.3d at 1146. Second, Defendants' agreement, as a condition of dismissal, to produce any evidence and employees deemed relevant by an Indonesian court makes their evidence available in either forum. *See Lueck*, 236 F.3d at 1146; *Da Rocha*, 451 F. Supp. 2d at 1324; *Taiwan Straits*, 331 F. Supp. 2d at 1196. Given that Defendants' evidence will be available in Indonesia, but that, conversely, U.S. courts lack compulsory process over the multitude of critical witnesses and documents located there, this private interest factor weighs heavily in favor of dismissal. *See Lueck*, 236 F.3d at 1147 ("[B]ecause the district court cannot compel production of much of the New Zealand evidence, whereas the parties control, and therefore can bring, all the United States evidence to New Zealand, the private interest factors weigh in favor of dismissal."); *see also Baumgart*, 981 F.2d at 836-37; *Gambra*, 377 F. Supp. 2d at 820; *Zermeno v. McDonnell Douglas Corp.*, 246 F. Supp. 2d 646, 660 (S.D. Tex. 2003).[16]

### 4. It is likely not possible to join Mandala and is impossible to join Angkasa Pura II in this case.

Neither Mandala nor Angkasa Pura II can likely be joined in U.S. litigation. Mandala likely lacks a sufficient connection to the U.S. (for example, it does not operate here and its personnel have not visited here) to demonstrate the requisite jurisdictional "minimum contacts."[17] Angkasa Pura II, as a company wholly owned by the Indonesian government, is a foreign sovereign as defined in the Foreign Sovereign Immunities Act and is therefore immune from suit in the U.S. *See* 28 U.S.C. §§ 1603(b)(2); 1604, 1605; *Compania Mexicana de Aviacion, S.A. v. U.S. District Court*, 859 F.2d 1354 (9th Cir. 1988).

Defendants would be prejudiced by trials in the U.S. without Mandala and Angkasa Pura II. If Defendants can show that the Accident and injuries were caused solely by the

---

[16] Illinois is not a convenient forum for access to evidence because none of the relevant evidence in Defendants' control is here. Any such evidence is located in Washington or Connecticut. *Torreblanca De Aguilar v. The Boeing Co.*, 806 F. Supp. 139, 144 (E.D. Tex. 1992) ("The fact that some evidence concerning the aircraft's design and manufacture may be located elsewhere in the United States does not make the Eastern District of Texas a convenient forum."), *aff'd*, 11 F.3d 55 (5th Cir. 1993).

[17] Underscoring this, Mandala has stated that "it will not agree to submit voluntarily to jurisdiction in the U.S. It does not believe that a US Court would have jurisdiction over it to require its participation." Kendrick Ex. C.

negligence of the airline, the pilots, or the airport operator, they will be relieved of all liability. Here, where Mandala and Angkasa Pura II will only be "empty chairs," no judgment can be entered against them and Defendants will lack access to their evidence. *See supra* section III.B.2. This will seriously prejudice Defendants in their ability to fully and fairly defend these cases and this factor weighs heavily in favor of dismissal. *See Piper Aircraft*, 454 U.S. at 259 ("Joinder of the pilot's estate, Air Navigation, and McDonald is crucial to the presentation of petitioner's defense."); *In re Factor II*, 484 F.3d at 958 (noting district court's reliance on the inability to join foreign third-party defendants as a private interest factor favoring dismissal); *Satz*, 244 F.3d at 1284 n.4 (noting the ineffectiveness of the "empty chair[]" defense because the trier of fact "would have available only one, rather than several, defendants to bear the brunt of its verdict and damage award"); *Van Schijndel*, 434 F. Supp. 2d at 780 ("the absence of [the operator] . . . creates the risk of significant prejudice to" defendants).

These difficulties would be eliminated if this case were refiled in Indonesia. There are a variety of ways that either plaintiffs or Defendants can join both Mandala and Angkasa Pura II in an Indonesian action. Lubis ¶¶ 28-32. In fact, Indonesian jurisprudence adheres to the doctrine of "incompleteness of parties" which mandates that all entities "closely related" to a case must be joined. *Id.* ¶ 32. FNC is therefore warranted to ensure that the actions can be refiled in Indonesia where all possible tortfeasors may be brought before the same court. *See Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 161 (S.D.N.Y. 2004).

**5.    An Indonesian factfinder can view the accident site.**

Viewing the accident site would provide context to the factfinder and assist in the valuation of the claim for damage to property in the neighborhood adjacent to the Medan airport. Kendrick ¶ 13(b) (identifying one real property damage claim). It would also assist in explaining the route the emergency firefighting and rescue personnel had to take from the airport to the accident site and provide context for the apparent delayed emergency response. Accordingly, this factor favors dismissal. *Piper Aircraft*, 454 U.S. at 243; *In re Bridgestone/Firestone I*, 305 F. Supp. 2d at 936.

**C.    The Public Interest Factors Also Strongly Favor Dismissal.**

The public interest factors include the local interest in having localized controversies decided at home, the unfairness of burdening citizens in an unrelated forum with jury duty, administrative difficulties related to court congestion, and the avoidance of problems in conflicts

of law or in application of foreign law. *Gulf Oil*, 330 U.S. at 508-09; *Kamel*, 108 F.3d at 803. The public interest factors also weigh heavily in favor of dismissal.

> 1. **Indonesia's interest in deciding this dispute is significant while the U.S. has, at most, a "mere passing interest."**

There can be no dispute that Indonesia has a significant interest in this controversy. As a preliminary matter, Indonesia has a strong interest in whether the Releases, which were negotiated and executed in Indonesia by Indonesian parties, and that on their face extinguish liability arising out of an Indonesian air crash, are valid and enforceable. This is especially so since a determination about the Releases' validity could expose Mandala (one of its own corporations) to additional liability. *Chhawchharia*, 657 F. Supp. at 1161 ("India's interest in determining the validity and effect of the release is even greater [than the U.S. interest] . . . ."); *see also Damigos*, 716 F. Supp. at 109.

Indonesia's interest is even greater given the nature of the underlying dispute. An aircraft operated by an Indonesian airline that is regulated by Indonesian authorities crashed on takeoff from an airport in Indonesia that is operated by a company owned by the Indonesian government. The accident injured and/or killed predominantly Indonesian passengers, crew, and ground victims, and it damaged an Indonesian neighborhood near the airport. In accordance with domestic Indonesian law and international norms, because the Accident occurred in Indonesia, Indonesian authorities are responsible for conducting the official accident investigation to determine the probable cause of the crash. These facts standing alone are sufficient to establish that Indonesia has a "very great" interest in the litigation. Priyatna ¶¶ 11, 14-16. *See Piper Aircraft*, 454 U.S. at 260; *Esheva*, 499 F. Supp. 2d at 500; *In re Athens*, 479 F. Supp. 2d at 804; *Taiwan Straits*, 331 F. Supp. 2d at 1204. Indonesia not only has a "great" interest in "ensuring that the heirs and beneficiaries of the majority of those on [the flight] are compensated and treated fairly," *Gambra*, 377 F. Supp. 2d at 825, but Indonesia also has a significant interest in "regulating the use of allegedly defective products within its borders . . . [and] an interest in protecting the health and safety of its residents," *In re Bridgestone/Firestone II*, 420 F.3d at 705.

The recent initiatives taken by the Indonesian government to improve civil aviation safety in the wake of a series of accidents, including the Accident at issue here, underscores the very significant interest that Indonesia has in this controversy. These initiatives include the creation and work of the EKKT; the safety audit and ranking of all Indonesian airlines; and the execution of a joint agreement with the International Civil Aviation Organization to improve Indonesian

civil aviation safety. Priyatna ¶¶ 22-25. Indeed, as Priyatna, an aviation and space law expert, legal advisor to the Indonesian Ministry of Transportation and the DGAC, and Presidential appointee to the EKKT, states, in light of the Indonesian government's wholesale review of the Indonesian civil aviation infrastructure, Indonesia's interest in this case is "very significant." Priyatna ¶ 27; *see also In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*, 408 F. Supp. 2d 569, 589 (N.D. Ill. 2006) (*"In re Factor I"*) (governmental interest in regulated industry such as passenger aircraft operations is "particularly strong"), *aff'd*, 484 F.3d 951 (7th Cir. 2007). The Indonesian government's efforts to understand and prevent accidents like this one demonstrate a compelling interest in this case. *Cf. In re Athens*, 479 F. Supp. 2d at 804 (criminal investigation into accident's cause demonstrates "strong" governmental interest).

Given the Indonesian government's intense focus on civil aviation safety and the concomitant press coverage and public attention, this litigation would be followed closely by the public, the press, and the Indonesian government were it refiled in Indonesia. Priyatna ¶¶ 28, 29. As Priyatna concludes, this litigation would be most "fittingly hosted in Indonesia" where the Indonesian government and people could "oversee and derive direct benefit from" the litigation process. *Id.* ¶ 27. This consideration strongly favors dismissal. *See Esheva*, 499 F. Supp. 2d at 500 ("[L]itigation in Russia would allow the people most affected by the accident to have access to the litigation proceedings in a way that could never be achieved if the actions proceeded in this country."); *see also Gulf Oil*, 330 U.S. at 509 ("In cases which touch on the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only.").

In contrast, neither Illinois nor the U.S. has more than a "mere passing interest" in these cases—which is in no way sufficient to outweigh the interests of Indonesia. *See Kamel*, 108 F.3d at 805; *In re Bridgestone/Firestone I*, 305 F. Supp. 2d at 938. First, the Defendants' activities related to the airplane and engines involved here occurred in Washington and Connecticut, respectively. Accordingly, Illinois, where this case would be tried, has little relationship to, and thus little interest in, this action. *Taiwan Straits*, 331 F. Supp. 2d at 1203; *Van Schijndel*, 434 F. Supp. 2d at 784.

Second, the fact that Boeing moved its corporate headquarters to Chicago long after it sold the accident aircraft does not give this or any other U.S. forum an overriding interest in the litigation—especially when compared to the compelling interests of Indonesia. *In re Factor II*,

484 F.2d at 959; *Lueck*, 236 F.3d at 1147; *Kamel*, 108 F.3d at 805 (all affirming FNC dismissals of defendants sued in their home forums); *see McDonald's*, 960 F. Supp. at 1320 (principal place of business within forum "does not present much of a localized controversy").

Third, as the Supreme Court has expressly held, any generalized U.S. interest in deterring the production of defective products does not require a U.S. court to retain jurisdiction when another country has a greater interest in the litigation. *Piper Aircraft*, 454 U.S. at 260-61; *In re Athens*, F. Supp. 2d at 804; *Da Rocha*, 451 F. Supp. 2d at 1325; *Taiwan Straits*, 331 F. Supp. 2d at 1205; *see Macedo v. The Boeing Co.*, 693 F.2d 683, 686 (7th Cir. 1982) ("The fact that the aircraft was manufactured in the [U.S.] does not make the accident, involving a Portuguese airline, an airport in Portugal, predominantly Portuguese plaintiffs and Portuguese witnesses, any less a matter of local Portuguese interest.").[18]

### 2. There is no reason to burden this Court or a jury in Illinois with resolving litigation in which they have no meaningful interest.

Maintaining these actions in this forum would create a significant burden on the Court and jurors in Illinois. The Court and jurors would be forced to delve into complex issues relating to an Indonesian airline's flight operations, crew training, and maintenance; issues related to the proper design and implementation by a state-owned Indonesian company of emergency plans for an Indonesian airport; and engineering questions regarding the proper design, manufacture and operation of a 737-200 aircraft and its engines. In addition, the Court and Illinois jurors would be required to sift through damages claims arising from injuries, deaths, and property damage of 98 passengers and ground victims, all of whom were or are foreigners and none of whom reside in the U.S., let alone Illinois. This would be a substantial undertaking, *see In re Factor I*, 408 F. Supp. 2d at 588 (individual trials in hemophiliac/HIV cases would "require many months of court time"), out of proportion to this forum's, at best, passing interest in these cases, *see Nolan v. The Boeing Co.*, 762 F. Supp. 680, 684 (E.D. La. 1989) ("no justification" for retaining jurisdiction when trials arising from foreign aviation accident involving 100 plaintiffs "could be expected to last months"), *aff'd*, 919 F.2d 1058 (5th Cir. 1990); *Baumgart v. Fairchild Aircraft*

---

[18] In *Macedo*, which arose out of a Portuguese air crash, the Seventh Circuit reversed the district court's FNC dismissal because the district court had not fully considered all of the *Gulf Oil* factors. *See Macedo v. The Boeing Co.*, 693 F.2d 683 (7th Cir. 1982). On remand, after a careful analysis, the district court once against granted the FNC motion and the case was dismissed. *See Boskoff v. The Boeing Co.*, 17 Avi. 18,613 (N.D. Ill. June 1, 1983). Kendrick Ex. K. And, in the intervening 23 years since *Macedo*, courts have routinely dismissed cases on similar facts. *See* supra n.2.

*Corp.*, Civ. A. No. SA-90-CA-818, 1991 WL 487242, at *7 (W.D. Tex. Sept. 30, 1991) (trials involving 19 foreign plaintiffs would take a substantial amount of time to try and public interest factors favored dismissal even though aircraft designed, manufactured, and tested in Texas), *aff'd*, 981 F.2d 824 (5th Cir. 1993).

Conversely, adjudicating these cases in Indonesia would enable the people most affected—the victims and their families, residents of the neighborhood where the crash occurred, and the Indonesian public—to have direct access to the trial. *See Esheva*, 499 F. Supp. 2d at 500; *Van Schijndel*, 434 F. Supp. 2d at 783-84; *Helog Ag v. Kaman Aerospace Corp.*, 228 F. Supp. 2d 91, 93 (D. Conn. 2002) ("[T]rying the case to a jury far from the place of the accident (and plaintiffs' domiciles) is not in the public interest."). Given the significantly greater Indonesian interest in this case, it "would be unfair" to burden Illinois and its citizens with these cases. *In re Athens*, 479 F. Supp. 2d at 804; *see also Piper Aircraft*, 454 U.S. at 252; *In re Bridgestone/Firestone II*, 420 F.3d at 705.[19]

### 3. Dismissal would avoid unnecessary conflicts of law problems and the necessity of applying Indonesian law.

FNC "is designed in part to help courts avoid conducting complex exercises in comparative law." *Piper Aircraft*, 454 U.S. at 251; *In re Athens*, 479 F. Supp. 2d at 804-05. Cases arising from foreign aircraft accidents inevitably "pose complex choice of law issues." *In re Athens*, 479 F. Supp. 2d at 804; *see also In re Air Crash at Belle Harbor, New York on Nov. 12, 2001*, No. MDL 1448, 2006 WL 1288298, at *4 (S.D.N.Y. May 9, 2006). Because retention of this action would require the Court to "'untangle problems in conflict of laws, and in law foreign to itself,'" this public interest factor (like all the other factors) "point towards dismissal." *Piper Aircraft*, 454 U.S. at 251 (quoting *Gulf Oil*, 330 U.S. at 509).

First, if the Court were to address any questions regarding the Releases's validity, it would have to "untangle" Indonesian law, which must apply to those issues by virtue of the Release's choice-of-law clause. Lubis ¶ 54; *see also Damigos*, 716 F. Supp. at 108 n.5 (FNC granted when Greek law deemed likely to apply to release executed in Greece by Greek citizens in case involving a Greek vessel). Second, in addressing liability and damages issues, the Court

---

[19] Were these cases refiled in Indonesia, they would likely be resolved in the District Court within 6-12 months (*see* Lubis ¶ 43), as opposed to a median time to trial of 25.5 months in the Northern District of Illinois (Kendrick Ex. I). The relatively shorter time to trial in Indonesia further supports dismissal. *In re Factor II*, 484 F.3d at 958-59.

would also be required to engage in the type of complex choice-of-law analysis that FNC is designed to avoid. *Piper Aircraft*, 454 U.S. at 251.

In determining which law applies to any particular issue, this Court must apply the "most significant relationship" as adopted by Illinois. *See Esser v. McIntyre*, 169 Ill. 2d 292, 298 (1996). According to that test, the law of Indonesia—where the injuries occurred—should govern, unless another state or country has a more significant relationship with the occurrence and with the parties. *Id.* Selection of the jurisdiction with the most significant relationship requires analysis of each competing jurisdiction's contacts with the occurrence and parties, in light of the policies underlying the conflicting laws. *Id.* Maintenance of these cases would require a separate choice-of-law analysis with respect to each legal issue for which a conflict exists between Indonesian law and the law of another jurisdiction—be it an issue relating to compensatory damages or liability. *See In re Air Crash Disaster Near Chicago, Ill., on May 25, 1979*, 644 F.2d 594, 611 (7th Cir. 1981); *see also Esser*, 169 Ill. 2d at 298; Restatement (Second) of Conflict of Laws § 145(1) & cmt. d at 417 (1971).

With respect to the legal issues relating to compensatory damages, the Court here would be called upon to sort through an area rife with potential conflicts. At a minimum, the Court must address a conflict between Indonesian law and Illinois law (which plaintiffs allege applies) as to the identity of proper wrongful death beneficiaries. *Compare* Lubis ¶ 50 (dependent parents are beneficiaries) *with Holmgren v. Nat'l Big-4 Asbestos Removal Specialty, Inc.*, 228 Ill App. 3d 433, 435 (1992) (parents not beneficiaries when spouse survives). Further, while Indonesian law generally allows the recovery of material and non-material losses, the Court would also be required to define more precisely the exact types of material and non-material damages recoverable under Indonesian law as compared to Illinois law.

A similar analysis must be done with respect to a determination of the liability rules that will apply to Boeing and UTC. *See Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844-46 (7th Cir. 1999) (applying foreign liability law of country where injuries occurred). This analysis would be even more complicated given that the injuries occurred in Indonesia, but plaintiffs' claims against Boeing and UTC arise from conduct that took place in Washington and Connecticut, respectively.

While this choice-of-law analysis is, at best, complex, one thing is clear: Illinois has no relationship to the occurrence and its relationship to the parties is, at best, passing. Plaintiffs and

UTC have no relationship to Illinois, the relevant conduct by Boeing occurred in Washington, and Boeing's move to Illinois occurred 20 years after the aircraft was delivered. Given Indonesia's significant relationship to the Accident and the parties, it is likely that if this case remains here, the Court would be required to apply Indonesian law to many issues. *See Macedo*, 693 F.2d at 690 ("Portuguese law would surely be applicable to many" issues in litigation of Portuguese air crash and decedents). Dismissal in favor of refiling in Indonesia would relieve the Court of this complicated choice-of-law analysis and the application of foreign law. This factor thus points strongly in favor of dismissal. *Kamel*, 108 F.3d at 805 (FNC granted when court would have to "presid[e] over a trial in which it would have to delve into the tenets of an unfamiliar legal system"); *Alexander Proudfoot*, 860 F. Supp. at 545 (application of foreign law "strongly points toward dismissal in considering a [FNC] claim"); *see also Satz*, 244 F.3d at 1284 (FNC granted given "possibility" that the court would have to apply foreign law).

## IV.    CONCLUSION

Indonesia is an available and adequate alternative forum for plaintiffs' claims. As the home forum for the vast majority of these plaintiffs (and their decedents), as well as the site of the Accident and the domicile of the airline Mandala, the airport operator Angkasa Pura II, their regulator the DGAC, and the investigating KNKT agency, the private and public interest factors strongly favor Indonesia over the U.S. These factors tip overwhelmingly in favor of Indonesia when the Releases are considered. Boeing and UTC therefore respectfully request that the Court dismiss plaintiffs' claims on the grounds of FNC.

DATED: October 26, 2007.

Respectfully submitted,

/s/ William T. Cahill
One of the attorneys for
Defendant The Boeing Company

William T. Cahill
Jonathan R. Buck
PERKINS COIE LLP
131 South Dearborn Street, Suite 1700
Chicago, IL 60603-5569
(312) 324-8400

Allison Kendrick
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
(206) 359-8000

/s/ William F. DeYoung
One of the attorneys for
Defendant United Technologies Corporation

William F. DeYoung
Loretto M. Kennedy
Kendall E. Woods
CHUHAK & TECSON, P.C.
30 S. Wacker Drive, Suite 2600
Chicago, IL 60606
(312) 444-9300

## CERTIFICATE OF SERVICE

I, William T. Cahill, certify that on October 26, 2007, I caused a true and complete copy of DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS ON THE GROUNDS OF FORUM NON CONVENIENS to be served via CM/ECF upon:

> Floyd A. Wisner
> WISNER LAW FIRM
> 934 S. 4th St.
> St. Charles, IL 60174
>
> Brian J. Lawler
> LIEFF GLOBAL LLP
> 275 Battery Street, 30th Floor
> San Francisco, CA 94111

and via hand delivery upon:

> Joseph A. Power, Jr.
> Todd A. Smith
> POWER, ROGERS & SMITH, P.C.
> 70 W. Madison St., Suite 5500
> Chicago, IL 60602

s/ William T. Cahill