**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDRE ADIPUTRA, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>THE BOEING COMPANY, *et al.*,<br><br>    Defendants. | Case No. 07 C 250<br><br>(and consolidated and related civil cases<br>No. 07 CV 1387; No. 07 CV 4845;<br>No. 07 CV 4954; No. 08 CV 2358;<br>No. 08 CV 2359; No. 08 CV 3324;<br>No. 08 CV 3325)<br><br>MDL 1925<br>(Case No. 08 CV 2357<br><br>Honorable John F. Grady |

**DEFENDANTS' JOINT MEMORANDUM OF LAW
IN SUPPORT OF THEIR AMENDED MOTION TO DISMISS ON THE GROUNDS OF
FORUM NON CONVENIENS**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................... 1

II.    BACKGROUND .................................................................................................. 5

    A.  The Accident and Resulting Investigation ............................................ 5

    B.  Indonesian Civil Aviation .................................................................... 6

    C.  The Flight 91 Claims History and Litigation ........................................ 7

III.   ARGUMENT ...................................................................................................... 10

    A.  Indonesia Is an Available and Adequate Alternative Forum ................ 11

        1.  Indonesia is an available forum ................................................ 12

        2.  Indonesia is an adequate forum ................................................ 12

    B.  The Private Interest Factors Strongly Favor Dismissal ....................... 14

        1.  The ease of access to sources of proof factor favors Indonesia ............... 14

            a.  Evidence regarding the Releases is in Indonesia ......................... 15

            b.  Critical liability evidence is in Indonesia ..................................... 15

            c.  Damages evidence is in Indonesia ............................................... 17

        2.  Many critical witnesses are beyond the reach of compulsory process .................................................................................... 19

        3.  In contrast, all relevant evidence in Defendants' control will be available in Indonesia ............................................................... 21

        4.  It is likely not possible to join Mandala and is impossible to join Angkasa Pura II in this case ..................................................... 22

        5.  An Indonesian fact-finder can view the accident site ............... 23

    C.  The Public Interest Factors Also Strongly Favor Dismissal ............... 23

        1.  Indonesia has an overwhelming interest in deciding this dispute, far outweighing the interest of any possible U.S. forum ........... 23

        2.  There is no reason to burden any U.S. court or jury with resolving litigation in which Indonesia has such a significant and overwhelming interest .............................................................. 28

        3.  Dismissal would avoid unnecessary conflict of laws problems and the necessity of applying Indonesian law .................................. 29

IV.    CONCLUSION ................................................................................................... 31

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alexander Proudfoot, Plc v. Fed. Ins. Co.,*
860 F. Supp. 541 (N.D. Ill. 1994) ........................................................................................ 21, 31

*Baumgart v. Fairchild Aircraft Corp.,*
981 F.2d 824 (5th Cir. 1993) ...................................................................... 14, 21, 27, 28

*Baumgart v. Fairchild Aircraft Corp.,*
Civ. A. No. SA-90-CA-818, 1991 WL 487242 (W.D. Tex. Sept. 30, 1991) ........................... 28

*Boskoff v. Boeing Co.,*
17 Avi. 18 (N.D. Ill. June 1, 1983) ........................................................................................ 27

*Carney v. Singapore Airlines,*
940 F. Supp. 1496 (D. Ariz. 1996) .................................................................................. 11, 19

*Cheng v. Boeing Co.,*
708 F.2d 1406 (9th Cir. 1983) ............................................................................................ 2, 10

*Chhawchharia v. Boeing Co.,*
657 F. Supp. 1157 (S.D.N.Y. 1987) .................................................................................. 18, 23

*Clerides v. Boeing Co.,*
534 F.3d 623 (7th Cir. 2008) ........................................ 2, 4, 10, 14, 19, 20, 21, 24, 25

*Compania Mexicana de Aviacion, S.A. v. U.S. Dist. Court,*
859 F.2d 1354 (9th Cir. 1988) .............................................................................................. 22

*Da Rocha v. Bell Helicopter Textron, Inc.,*
451 F. Supp. 2d 1318 (S.D. Fla. 2006) ............................................... 2, 15, 16, 19, 21, 27

*Dahl v. United Techs. Corp.,*
632 F.2d 1027 (3d Cir. 1980) .............................................................................................. 19

*Damigos v. Flanders Compania Naviera, S.A.-Panama,*
716 F. Supp. 104 (S.D.N.Y. 1989) .................................................. 12, 15, 20, 23, 29

*De Aguilar v. Boeing Co.,*
11 F.3d 55 (5th Cir. 1993) ...................................................................................................... 2

*Dugan v. Mobile Med. Testing Servs., Inc.,*
830 A.2d 752 (Conn. 2003) .................................................................................................. 30

*Ellis v. Barto,*
918 P.2d 540 (Wash. Ct. App. 1996) ...................................................................................... 30

*Esheva v. Siberia Airlines,*
499 F. Supp. 2d 493 (S.D.N.Y. 2007) ................................................................. 2, 24, 25, 29

*Esser v. McIntyre,*
169 Ill. 2d 292 (1996) .......................................................................................................... 30

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Gambra v. Int'l Lease Fin. Corp.*,
 377 F. Supp. 2d 810 (C.D. Cal. 2005) ..................................................................... 2, 21, 24, 27

*Gonzales v. P.T. Pelangi Niagra Mitra Int'l*,
 196 F. Supp. 2d 482 (S.D. Tex. 2002) ..................................................................................... 11

*Gulf Oil Corp. v. Gilbert*,
 330 U.S. 501 (1947)................................................................................ 14, 19, 20, 23, 25, 29

*Helog AG v. Kaman Aerospace Corp.*,
 228 F. Supp. 2d 91 (D. Conn. 2002)................................................................................. 27, 29

*Holmgren v. Nat'l Big-4 Asbestos Removal Specialty, Inc.*,
 228 Ill App. 3d 433 (1992) ........................................................................................................ 30

*Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*,
 58 F. Supp. 2d 925 (N.D. Ill. 1999) ......................................................................................... 13

*In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*,
 No. MDL 1448, 2006 WL 1288298 (S.D.N.Y. May 9, 2006)................................................. 29

*In re Air Crash Disaster Near Chi., Ill., on May 25, 1979*,
 644 F.2d 594 (7th Cir. 1981) .................................................................................................... 30

*In re Air Crash Near Athens, Greece on Aug. 14, 2005*,
 479 F. Supp. 2d 792 (N.D. Ill. 2007), *aff'd sub nom.*
 *Clerides v. Boeing Co.*, 534 F.3d 623 (7th Cir. 2008) ............................ 2, 10, 13, 17, 27, 28, 29

*In re Air Crash Near Peixoto De Azeveda, Brazil, on Sept.29, 2006*,
 No. 07 MD 1884 (E.D.N.Y. July 2, 2008)........................................................ 2, 24, 26, 28, 31

*In re Air Crash Over Taiwan Straits on May 25, 2002*,
 331 F. Supp. 2d 1176 (C.D. Cal. 2004) ........................................... 2, 10, 16, 18, 21, 24, 25, 27

*In re Bridgestone/Firestone, Inc.*,
 305 F. Supp. 2d 927 (S.D. Ind. 2004) ........................................................................... 19, 23, 25

*In re Bridgestone/Firestone, Inc.*,
 420 F.3d 702 (7th Cir. 2005) ................................................................................ 10, 18, 24, 29

*In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*,
 190 F. Supp. 2d 1125 (S.D. Ind. 2002) .................................................................................... 10

*In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*,
 540 F. Supp 1141 (D.D.C. 1982) ............................................................................................. 18

*In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*,
 408 F. Supp. 2d 569 (N.D. Ill. 2006) ................................................................................. 24, 28

*In re Factor VIII or IX Concentrate Blood Prods. Litig.*,
 484 F.3d 951 (7th Cir. 2007) ........................................................................... 10, 12, 22, 24, 29

*In re Factor VIII or IX Concentrate Blood Prods. Litig.*,
 531 F. Supp. 2d 957 (N.D. Ill. 2008) ........................................................... 15, 19, 23, 25, 27, 28

## TABLE OF AUTHORITIES
### (continued)

Page

*Jennings v. Boeing Co.*,
660 F. Supp. 796 (E.D. Pa. 1987) ............................................................................................ 27

*Johnson v. Spider Staging Corp.*,
555 P.2d 997 (Wash. 1976) ...................................................................................................... 30

*Kamel v. Hill-Rom Co.*,
108 F.3d 799 (7th Cir. 1997) ........................................................ 10, 11, 12, 13, 19, 23, 25, 31

*Kryvicky v. Scandinavian Airlines Sys.*,
807 F.2d 514 (6th Cir. 1986) ..................................................................................................... 2

*Lueck v. Sundstrand Corp.*,
236 F.3d 1137 (9th Cir. 2001) ................................................................. 2, 16, 21, 25, 26, 28

*Macedo v. Boeing Co.*,
693 F.2d 683 (7th Cir. 1982) ............................................................................................ 27, 31

*McDonald's Corp. v. Bukele*,
960 F. Supp. 1311 (N.D. Ill. 1997) .................................................................................... 21, 25

*Mercier v. Sheraton Int'l, Inc.*,
981 F.2d 1345 (1st Cir. 1992) ................................................................................................. 13

*Nai-Chao v. Boeing Co.*,
555 F. Supp. 9 (N.D. Cal. 1982) ............................................................................................. 20

*Nolan v. Boeing Co.*,
762 F. Supp. 680 (E.D. La. 1989),
*aff'd*, 919 F.2d 1058 (5th Cir. 1990) ...................................................................................... 28

*Pain v. United Techs. Corp.*,
637 F.2d 775 (D.C. Cir. 1980) ............................................................................................ 2, 19

*Paolicelli v. Ford Motor Co.*,
No. 06-13688, 2008 WL 3855042 (11th Cir. Aug. 20, 2008) ........................................... 14, 21

*Philippides v. Bernard*,
88 P.3d 939 (Wash. 2004) ....................................................................................................... 30

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981) ................................. 2, 3, 4, 10, 11, 13, 14, 15, 22, 23, 24, 26, 27, 29, 30

*PT Indopac Perdana Fin. v. Masagung*,
Nos. 00-17345, 01-15622, 2002 WL 505915 (9th Cir. Apr. 1, 2002) ..................................... 11

*PT United Can Co. v. Crown Cork & Seal Co.*,
138 F.3d 65 (2d Cir. 1998) ................................................................................................. 11, 13

*Pyrenee, Ltd. v. Wocom Commodities Ltd.*,
984 F. Supp. 1148 (N.D. Ill. 1997) ......................................................................................... 21

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*,
361 F.3d 11 (1st Cir. 2004) ..................................................................................................... 20

## TABLE OF AUTHORITIES
### (continued)

Page

*Reers v. Deutsche Bahn AG*,
320 F. Supp. 2d 140 (S.D.N.Y. 2004) ...................................................................................... 23

*Satz v. McDonnell Douglas Corp.*,
244 F.3d 1279 (11th Cir. 2001) .............................................................. 2, 19, 22, 31

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
127 S. Ct. 1184 (2007).......................................................................................... 10

*Spinozzi v. ITT Sheraton Corp.*,
174 F.3d 842 (7th Cir. 1999) ............................................................................... 31

*Tjontveit v. Den Norske Bank ASA*,
997 F. Supp. 799 (S.D. Tex. 1998)......................................................................... 12

*Tucci v. Club Mediterranee, S.A.*,
107 Cal. Rptr. 2d 401 (Cal. Ct. App. 2001)............................................................ 30

*U.S.O. Corp. v. Mizuho Holding Co.*,
No. 06 C 0459, 2007 WL 2893628 (N.D. Ill. Sept. 27, 2007)................................... 20

*Van Schijndel v. Boeing Co.*,
434 F. Supp. 2d 766 (C.D. Cal. 2006) .................................. 2, 16, 19, 20, 22, 25, 29

*Vasquez v. Bridgestone/Firestone, Inc.*,
325 F.3d 665 (5th Cir. 2003) ............................................................................... 19

*Zermeno v. McDonnell Douglas Corp.*,
246 F. Supp. 2d 646 (S.D. Tex. 2003) .............................................................. 17, 21

*Zipfel v. Halliburton Co.*,
832 F.2d 1477 (9th Cir. 1987),
*amended on other grounds*, 861 F.2d 565 (9th Cir. 1988) ....................................... 11

**Statutes**

28 U.S.C. § 1603(b)(2) .......................................................................................... 22

28 U.S.C. § 1604.................................................................................................. 22

28 U.S.C. § 1605.................................................................................................. 22

Cal. Civ. Pro. C. § 377.60...................................................................................... 26

**Regulations and Rules**

Fed. R. Civ. P. § 45(c)(3)(A)(ii) ............................................................................. 19

Fed. R. Civ. P. § 45(e) .......................................................................................... 19

**Treatises**

Restatement (Second) of Conflict of Laws § 145(1) (1971)......................................... 30

Restatement (Second) of Conflict of Laws § 414 (1971) ............................................ 30

## TABLE OF SUPPORTING DECLARATIONS

(1) Amended Declaration of Allison Kendrick in Support of Defendants' Amended Joint Motion to Dismiss on the Grounds of Forum Non Conveniens ("Kendrick")

(2) Declaration of Richard Breuhaus in Support of the Motion to Dismiss on the Grounds of Forum Non Conveniens ("Breuhaus")

(3) Supplemental Declaration of M. Priyatna Abdurrasyid in Support of Defendants' Amended Joint Motion to Dismiss on the Grounds of Forum Non Conveniens ("Priyatna")

(4) Harjanto Trijono's Declaration in Support of Boeing Company's Motion to Dismiss in the District Court of Northern Illinois on the Grounds of Forum Non Conveniens ("Haryanto")

(5) Declaration of Michael S. Bartron in Support of Defendants' Joint Motion to Dismiss on the Grounds of Forum Non Conveniens ("Bartron")

(6) Declaration of William F. DeYoung in Support of Defendants' Joint Motion to Dismiss on the Grounds of Forum Non Conveniens ("DeYoung")

## I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendants The Boeing Company ("Boeing") and United Technologies Corporation ("UTC") (collectively, "Defendants") move on the ground of forum non conveniens ("FNC") to dismiss the claims of 241 plaintiffs arising from the crash of a domestic Indonesian flight operated by an Indonesian airline into a neighborhood adjacent to the Polonia Airport in Medan, Indonesia on September 5, 2005 (the "Accident").[1]  Plaintiffs seek to recover for wrongful death (197 plaintiffs), personal injury or loss of consortium (44 plaintiffs) and property damage (183 plaintiffs).  The overwhelming majority of plaintiffs (235 of 241) are citizens and residents of Indonesia.  Likewise, the vast majority of the decedents were citizens and residents of Indonesia (109 of 114).  None of the passengers or ground victims was a U.S. citizen or resident and all of the property allegedly damaged is or was in Indonesia.  Indonesian authorities are responsible for the Accident investigation.  In short, plaintiffs' claims are inextricably tied to Indonesia. Indonesia provides an adequate alternative forum to resolve these claims and both the private and public interest factors that the Court must consider in performing its FNC analysis overwhelmingly indicate that Indonesia is the appropriate forum in which to litigate them.

Of the 241 plaintiffs, 192 previously accepted compensation and were named as Releasors in written agreements which they signed in Indonesia settling their claims in full (the "Releases").  The settling plaintiffs expressly released their claims not only against the Indonesian air carrier, Mandala Airlines ("Mandala"), but also against Boeing and UTC.  To the extent the settling plaintiffs contest the enforceability of the Indonesian Releases, as they must in order for their claims to proceed, the FNC private and public interest factors weigh heavily in favor of proceeding in Indonesia, where the Releases were negotiated and signed and the compensation was paid.  The Releases themselves provide that the settlements are governed by Indonesian law and that all disputes regarding the settlements must be resolved by an Indonesian

---

[1] This FNC motion and supporting memorandum apply to six cases: *Adiputra v. Boeing Co.*, 1:07-cv-00250; *Justyantoro v. Boeing Co.*, 1:07-cv-01387; *Zu v. Boeing Co.*, 1:07-cv-04845; *Adi v . Boeing Co.*, 1:07-cv-04954; *Kusumo v. Boeing Co.,* 1:08-cv-02358; and *Laksono v. Boeing Co.*, 1:08-cv-02359. Boeing understands that at least an additional 26 wrongful death claims and two personal injury claims against Boeing and UTC arising out of the Accident will soon be filed in the United States District Court for the District of Connecticut. Kendrick ¶ 14.  Those claims should then be consolidated with this litigation by the Judicial Panel on Multidistrict Litigation. Because all the plaintiffs and decedents involved in those forthcoming claims are Indonesian citizens and residents, *id.*, this motion will apply to them as well.

District Court. Furthermore, all of the witnesses and documents relating to the negotiation and execution of the Releases and the payment and receipt of the consideration for the Releases are located in Indonesia. Not only is it more convenient and less costly for this evidence to be presented to an Indonesian court, but Boeing and UTC likely would be unable to compel the production of such evidence in the United States. And only in Indonesia can all parties to the Releases be joined in a single action that fully adjudicates the Releases' validity. Under these circumstances, an Indonesian forum is by far the most convenient forum in which to resolve the issue of the Releases, which is potentially dispositive of the vast majority of these claims.

Aside from the Releases, this foreign aviation accident case fits squarely within the Supreme Court's controlling FNC decision of *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981), in which the Court applied FNC to dismiss claims brought by foreign plaintiffs against U.S. aircraft manufacturers arising from a foreign aviation accident. Since *Piper Aircraft*, federal courts have repeatedly exercised their authority to dismiss claims against U.S. product manufacturers arising from foreign aviation accidents.[2] Most recently, the Seventh Circuit, guided by *Piper Aircraft* and its progeny, affirmed the FNC dismissal of claims brought by Cypriot plaintiffs against Boeing arising out of the crash of a Cypriot 737 in Greece. *Clerides v. Boeing Co.*, 534 F.3d 623 (7th Cir. 2008), *aff'g In re Air Crash Near Athens, Greece on Aug. 14, 2005*, 479 F. Supp. 2d 792 (N.D. Ill. 2007) (granting FNC dismissal of consolidated multidistrict litigation brought by 90 Greek and/or Cypriot citizens, including two who resided in America).

Like those prior cases, these predominantly foreign plaintiffs bring wrongful death and injury claims arising out of an accident involving an aircraft operated and maintained by a foreign carrier on a foreign flight. With only one exception, none of the interested plaintiffs, or

---

[2] *See, e.g., Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279 (11th Cir. 2001); *Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001); *De Aguilar v. Boeing Co.*, 11 F.3d 55, 58-59 (5th Cir. 1993); *Kryvicky v. Scandinavian Airlines Sys.*, 807 F.2d 514 (6th Cir. 1986); *Cheng v. Boeing Co.*, 708 F.2d 1406 (9th Cir. 1983); *Pain v. United Techs. Corp.*, 637 F.2d 775 (D.C. Cir. 1980); *In re Air Crash Near Peixoto De Azeveda, Brazil, on Sept.29, 2006*, No. 07 MD 1884, at *1 (E.D.N.Y. July 2, 2008) (Kendrick Ex. K); *Esheva v. Siberia Airlines*, 499 F. Supp. 2d 493 (S.D.N.Y. 2007); *Da Rocha v. Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318 (S.D. Fla. 2006); *Van Schijndel v. Boeing Co.*, 434 F. Supp. 2d 766 (C.D. Cal. 2006); *Gambra v. Int'l Lease Fin. Corp.*, 377 F. Supp. 2d 810, 827 (C.D. Cal. 2005); *In re Air Crash Over Taiwan Straits on May 25, 2002*, 331 F. Supp. 2d 1176 (C.D. Cal. 2004).

the decedents for whom they bring suit, has any connection to the U.S.[3] In contrast, Indonesia is intricately connected to these actions. The Accident is being investigated by Indonesian governmental authorities. Reports indicate that the Mandala flight crew failed to properly configure the aircraft for takeoff and that the "slow" emergency response of the Indonesian company that operates the Polonia Airport, Angkasa Pura II, may have exacerbated the victims' injuries. Given these reports, Mandala's operations, maintenance, and flight crew training are especially critical from a liability standpoint. Similarly, Angkasa Pura II's emergency plan for the Polonia Airport (and the execution of that plan on the day of the Accident) is also critical. Thus, the official investigators, the documents related to the investigation, the aircraft wreckage, and the records relating to Mandala and Angkasa Pura II are in Indonesia. Likewise, as plaintiffs have confirmed in their responses to FNC discovery, the overwhelming majority of damages evidence is also in Indonesia. The only meaningful connections to the U.S. are that the commercial aircraft operations of Boeing are in Washington State and that UTC operations are in Connecticut. To date, only one of the six pending lawsuits has been filed in Washington, where the aircraft at issue was delivered at least 27 years ago. Four of the remaining lawsuits were filed in Illinois, which has no connection to the litigation other than the fact that more than 20 years after the accident airplane was delivered, Boeing moved its corporate headquarters there. The final lawsuit was filed in California, which has no real link to this litigation either.

Applying the standard established in *Piper Aircraft* and its progeny, courts have not hesitated to grant FNC dismissal in foreign aviation accident litigation against U.S. manufacturers with facts like those presented here. In this case, as in those prior cases, the FNC private interest factors strongly favor Indonesia. The majority of the liability evidence and all damages evidence is located outside the U.S. All the Indonesian evidence is beyond this Court's compulsory process (and very probably inaccessible even through letters rogatory), and neither Mandala nor Angkasa Pura II can likely be joined in the U.S.

Likewise, as in prior cases, the public interest factors also point overwhelmingly in favor of Indonesia. Importantly, Indonesia has recently demonstrated its considerable interest in this case specifically and civil aviation safety generally. This Accident is but one in a series of

---

[3] In the *Kusumo* case that is filed in California, one plaintiff is apparently a California resident and U.S. citizen. But she seeks recovery only on behalf of Indonesian citizens and residents. *See infra* section III.C.1.

Indonesian accidents during the last six years that prompted a wholesale and ongoing governmental review of the civil aviation system and the safety of Indonesian air carriers. As a result, the Indonesian government, press, and public have demonstrated a palpable interest in the issues that will be raised in this litigation. Moreover, Indonesia has the greatest interest in promptly and adequately compensating for the losses caused by the Accident. Any interests of U.S. courts, in contrast, are much more limited. There is no rational reason to burden any U.S. court or jury with what would undoubtedly be long, complicated liability trials or separate damages cases arising from the claims made by these 241 plaintiffs.

But this case presents an even more compelling FNC argument than in *Piper Aircraft*, *Clerides* and the many other foreign aviation accident cases in which FNC has been granted. Standing alone, the Release issues distinguish this case and tip the balance of private and public interests more toward dismissal. The balance tips even further when considering that this case—unlike prior cases involving only wrongful death claims—involves claims for serious personal injury, disability, and lost earning potential. Such claims depend substantially on the credibility of plaintiffs' current and former heath care providers and employers who are all outside the U.S. The balance tips even further still given that all evidence related to the property damage claims is located abroad, too. The presence of these additional considerations—none of which were present in combination in other recent foreign aviation accident cases dismissed on FNC grounds—decisively demonstrates that dismissal is warranted.

As conditions of dismissal, Defendants will agree to (1) consent to an Indonesian court's jurisdiction in actions refiled by these plaintiffs; (2) toll any statute of limitations that might apply to such refiled claims for 120 days after dismissal by this Court; (3) make available in actions refiled by these plaintiffs in the courts of Indonesia any evidence or witnesses in their possession, custody, or control in the U.S. that an Indonesian court deems relevant, and (4) pay or cause to be paid any final, post-appeal judgment awarded against Defendants by an Indonesian court in such refiled actions. Kendrick ¶ 20; DeYoung ¶ 2.[4]

---

[4] Boeing and UTC have entered into a "Joint Defense, Sharing, and Indemnity Agreement" that relates to these claims, which will not in any way prejudice the plaintiffs' rights to a recovery if this case is transferred.

## II.    BACKGROUND

### A.    The Accident and Resulting Investigation.

On September 5, 2005, Mandala Airlines Flight 91 crashed on takeoff at Polonia Airport
in Medan, Indonesia. Breuhaus ¶ 3. Flight 91 was headed to Jakarta on a domestic flight. *Id.*
As the aircraft attempted to take off at Medan it failed to become fully airborne, crashed into
approach lights at the end of the runway, crossed a busy street adjacent to the airport, and landed
in a neighborhood near the airport. The aircraft then caught fire. It reportedly took airport
rescue and firefighting teams nearly 30 minutes to reach the accident site and begin firefighting
and rescue operations. Priyatna ¶ 2; Kendrick Ex. G.

Of the 117 people on board Flight 91, 100 were killed and 15 were injured. Forty-nine
people on the ground were also killed and 26 were injured. Priyatna ¶ 2. None of those killed or
injured was from the U.S. The vast majority of those killed and all who were injured were or are
Indonesian citizens or residents. The few non-Indonesian decedents were from other Asian
countries. Kendrick ¶ 13(h)-(i); Priyatna ¶ 2; *see infra* p. 8 n.8. The Accident caused substantial
property damage in the neighborhood adjacent to the airport. Priyatna ¶ 2; Kendrick Ex. F.

Mandala is a domestic Indonesian airline. It operates and maintains its aircraft in
Indonesia. Breuhaus ¶ 6. It does not operate flights outside Indonesian territory, and has never
operated flights to the U.S. *Id.*; Kendrick Ex. C. Mandala's headquarters and base of
maintenance operations are located in Jakarta. Breuhaus ¶¶ 6, 12; Kendrick Ex. C. The accident
aircraft was a 24-year-old Boeing model 737-200 aircraft equipped with two Pratt & Whitney
model JT8D engines.[5] Breuhaus ¶ 4; Bartron ¶ 7. Boeing originally delivered the accident
aircraft to its first owner in 1981; Mandala purchased the aircraft from its first owner in 1994.
Breuhaus ¶ 4. The engines were originally installed on aircraft in 1970 and 1981, respectively.
Bartron ¶ 7. The accident aircraft was registered in Indonesia and was inspected and certified as
airworthy by the Indonesian Directorate General of Civil Aviation ("DGAC"). Breuhaus ¶ 4.
The DGAC has oversight responsibilities for the operations of Mandala, the qualifications and
training of Mandala flight crews, and the airworthiness of Mandala aircraft. *Id.* ¶¶ 4-6.

The Polonia Airport is operated by a company called Angkasa Pura II, which is wholly
owned by the Indonesian government. Breuhaus ¶ 8. Angkasa Pura II is responsible for the

---

[5] Pratt & Whitney is an unincorporated division of United Technologies Corporation that designs and
manufactures aircraft engines. *See* Bartron ¶¶ 2, 7.

operation of ten Indonesian airports, including the proper preparation for, and response to, accidents at these airports or in their immediate vicinity. *See id.* ¶¶ 8, 12, 14(d); Priyatna ¶ 16 & Ex. C at 31. As with Mandala, the Indonesian DGAC has oversight duties for Angkasa Pura II. Priyatna ¶ 27.

Because the Accident occurred in Indonesia, that country's National Transportation Security Committee (or "KNKT" in Indonesia) is responsible for conducting the official accident investigation. Wreckage recovered during the investigation, including the aircraft's engines and fuel pump, was collected by the KNKT and kept in its possession in Indonesia. The official records of the investigation and the individuals who are responsible for and leading the investigation are also in Indonesia. Breuhaus ¶¶ 9-12, 14(a), (b); Bartron ¶ 16. A representative from the U.S. National Transportation Safety Board ("NTSB") participated in the investigation. Boeing and UTC served as technical advisors to this representative and provided limited technical assistance to the investigation solely when requested by the KNKT or the NTSB. Breuhaus ¶¶ 10, 11, 13; Bartron ¶¶ 5, 9-12, 15. And while, as is typical in such investigations, limited and discrete activities occurred in the U.S., most investigation activities were conducted in Indonesia. Breuhaus ¶¶ 12-14; Bartron ¶ 15. Neither the NTSB, Boeing, or UTC has been involved in every aspect of the Indonesian government's investigation.

The Indonesian authorities have not yet released a final report from their investigation. Breuhaus ¶ 9. Nevertheless, it appears from public reports that both Mandala and Angkasa Pura II may bear fault for the Accident or the resulting deaths and injuries. It has been reported that the flight crew failed to properly set the flaps and correctly configure the aircraft for takeoff. Priyatna ¶ 2; Kendrick Ex. F. Angkasa Pura II has been faulted for its "slow" emergency response which increased the number of fatalities. Kendrick Ex. G at 31.

**B.      Indonesian Civil Aviation.**

The Accident was only one in a series of serious Indonesian aviation and other transportation accidents that have occurred over the last six years. These accidents have called into question the safety of the Indonesian civil aviation system, especially after the European Union put all Indonesian air carriers on its "blacklist" and the U.S. Federal Aviation Administration advised U.S. citizens not to fly on Indonesian airlines. Priyatna ¶ 21 & Exs. C, E-H). These events prompted the Indonesian government to take steps to evaluate and improve Indonesian civil aviation safety. The President of Indonesia formed a committee called the

6

National Transportation Safety and Security Evaluation Team (or "EKKT" in Indonesian) to evaluate the Indonesian national transportation infrastructure and implement policies for improving civil aviation safety and security. Priyatna ¶¶ 10, 17-18. The EKKT has proposed a nine-point plan for improvement. *Id.* ¶ 18. The Indonesian Ministry of Transportation has audited and ranked the safety of all Indonesian airlines, revoked and/or suspended the Air Operator's Certificate of poorly performing Indonesian airlines, and required low-rated airlines to make improvements. *Id.* ¶¶ 18, 24. And the Indonesian government has signed a joint agreement with the International Civil Aviation Organization to improve civil aviation safety in the country. *Id.* ¶ 26. Given the importance of aviation to Indonesia's transportation system, which spans 17,500 islands spread over 1.9 million square kilometers, the Indonesian press and the Indonesian public have a high level of interest in their government's efforts to improve, and the resulting state of, civil aviation safety. *See, e.g.*, Priyatna ¶¶ 12, 19, 20 & Ex. C (*Tempo Magazine* issue entitled "Grounded! Flying on Empty" that includes articles entitled "Indonesia's Flying Circus" and "Danger in the Skies, Hazards on the Ground.").

## C.     The Flight 91 Claims History and Litigation.

Almost immediately after the Accident, Mandala and its insurers compensated most of the victims and/or their families. 192 of the 241 plaintiffs here are named as "Releasors" in such settlements. Kendrick ¶¶ 4, 5. Mandala paid compensation ranging from 33,000,000 to 300,000,000 Indonesian Rupiahs in personal injury cases and 300,000,000 Indonesian Rupiahs in wrongful death cases. *Id.* ¶¶ 4, 5.[6] In exchange for this compensation, plaintiffs released their claims against not only Mandala, but also against Boeing and UTC. The Releases specifically identify Boeing and UTC[7] as released parties. Kendrick Exs. A, B; Haryanto ¶ 61 & Ex. B. All but two of the Releases were negotiated between Mandala representatives and the victims or their family members in Indonesia, executed in Indonesia, and witnessed by Indonesian witnesses and/or notaries. None was negotiated or executed in the U.S. Kendrick Ex. C; Haryanto ¶¶ 62, 67. Because these claims are "most closely connected to Indonesia," the Releases contain a choice-of-law clause selecting Indonesian law as the governing law.

---

[6] At the then-prevailing exchange rates, 300,000,000 Indonesian Rupiahs equaled approximately $30,000. Kendrick Exs. B, N.

[7] The Releases actually name Pratt & Whitney and its "affiliates" as "Releasees." UTC is an "affiliate" of Pratt & Whitney. Bartron ¶ 2.

7

Kendrick Ex. C. They also contain a choice-of-forum clause that selects an Indonesian District Court as the only forum that can resolve "any disputes arising out of or based on or in connection with" the Releases. *Id.*; Haryanto ¶ 64. The Releases are irrevocable and were intended to release completely Boeing and UTC from liability arising out of the Accident. Kendrick Ex. C; Haryanto ¶¶ 61, 62. The Releases are enforceable under Indonesian law. Haryanto ¶ 66.

Notwithstanding the Releases, six lawsuits arising out of the Accident have been filed in the U.S. Four multi-plaintiff lawsuits were filed in the Northern District of Illinois. An additional multi-plaintiff suit was filed in the Western District of Washington, and the final action was filed on behalf of a single decedent in the Central District of California. The Judicial Panel on Multidistrict Litigation consolidated actions arising out of the Accident for pretrial proceedings before this Court.

In these six actions, a total of 197 plaintiffs bring wrongful death claims on behalf of 114 decedents. Kendrick ¶ 13(a). None of the 114 decedents was a U.S. citizen or resident; 109 of them were citizens and residents of Indonesia. *Id.* ¶ 13(h). All but one of the 197 plaintiffs are foreign citizens and residents; 191 are citizens and residents of Indonesia. *Id.* ¶ 13(e), (f).[8] The lone plaintiff with any tie to the U.S. is plaintiff Willy Kusumo, who is alleged to be an American citizen and resident of California. *Id.* ¶ 13(i). She is the sister of decedent Wilson Kusumo who, at the time of the Accident, was a citizen and resident of Indonesia and married to Indonesian citizen and resident Sri Murni Djoko. Kusumo Complaint ¶¶ 5, 7, 11. Djoko has been named as a *defendant* in this action because she has reportedly refused to join plaintiff Kusumo in this case, having already settled her claims against Mandala, Boeing, and UTC in Indonesia. Plaintiff Willy Kusumo does not allege that she is an heir to her brother's estate *or* that she is entitled to assert on her own behalf a cause of action for wrongful death. *See* Kusumo Complaint ¶¶ 6-8. Instead, she alleges that she was appointed Administrator or Executor of Wilson Kusumo's estate in California where she resides (but far from where decedent Kusumo

---

[8] Five non-Indonesian plaintiffs are citizens and/or residents of the People's Republic of China, Malaysia, and Canada. Kendrick ¶ 13(f). Five decedents resided outside Indonesia: one was a citizen of Indonesia who resided in South Korea; one was a citizen and resident of Japan; two were residents and citizens of China; and one was a citizen and resident of Malaysia. The plaintiffs in these cases have identified 452 family members, heirs, and survivors of the decedents who seek damages for the deaths of these 114 decedents. 441 of these are Indonesian citizens and residents. Of the remaining alleged beneficiaries, one is a resident of Indonesia and a citizen of Japan; two are residents of Singapore, but citizens of Indonesia; four are citizens and residents of China; and four are citizens and residents of Malaysia. *Id.* ¶ 13(g).

resided) and that she received a power of attorney from her parents (who are also citizens and residents of Indonesia) to bring claims in the U.S. on their behalf. *Id.* ¶¶ 7, 9.[9]

In the six U.S. complaints, the plaintiffs generally assert product liability and negligence claims against Defendants. Plaintiffs in *Laksono* and *Kusumo* allege defects in the aircraft's fuel delivery system, engines, and engine control systems, as well as failures to warn regarding these alleged defects. *See* Laksono Amended Complaint at Count I, ¶ 77; Kusumo Complaint at Count I, ¶¶ 23, 35. The remaining plaintiffs do not identify with particularity a defect in the airplane or its engines, and instead generically allege that there were "defects in the engines, flaps, and warning systems of the subject aircraft," negligent instructions for "maintenance, repair, and operations," and that the "engines did not provide sufficient lift to takeoff under all reasonably foreseeable conditions." *See, e.g*, Adiputra Second Amended Complaint at Count I, ¶ 10, Count VII, ¶ 10; Adi Complaint at Count II, ¶ 11.

The accident aircraft was assembled and delivered to its original owner (a European airline) 27 years ago. Mandala acquired the accident aircraft from this European airline in November 1994. Breuhaus ¶ 4. Evidence regarding the design and assembly of the accident aircraft is within Boeing's possession in Washington State where its Commercial Airplanes division is headquartered and where the accident airplane was delivered in 1981. *Id.* 14(g). Although Boeing moved its worldwide headquarters to Chicago, Illinois in 2001 (20 years after it delivered the accident aircraft), the evidence related to its Commercial Airplanes division is maintained in Washington.

The two engines on the accident aircraft were manufactured in 1969 and 1981, respectively. Bartron ¶ 7. These engines were used by other operators until they came into Mandala's possession in approximately 1994 for one, and 2002 or 2003 for the other. *Id.* All of the limited documentary evidence regarding the design and manufacture of the engines on the accident aircraft is within UTC's possession in the State of Connecticut where UTC's headquarters (as well as that of its Pratt & Whitney division) is located. *Id.* ¶ 17. The engines that are the focus of these plaintiffs' claims, as well as related maintenance records, are in Indonesia. *See* Breuhaus ¶ 14(a).

---

[9] Contrary to the allegations in the Kusumo Complaint, a stipulation served by Willy Kusumo's counsel suggests that she might seek damages on her own behalf. However, as discussed in section III.C.1 *infra,* she has no standing to recover damages in her own right under any potentially applicable law.

Consistent with reported causes of the Accident, Boeing has pleaded in its Answers and Affirmative Defenses that Mandala and Angkasa Pura II caused or contributed to the Accident and subsequent injuries and thus their conduct is squarely at issue. *See, e.g.*, Answer and Affirmative Defenses to Amended Complaint and Jury Demand by Defendant The Boeing Company at 37, 38 (Second, Fourth, Fifth Defenses), filed in *Justyantoro v. Boeing Company*, Case No. 1:07-CV-1387. Since these entities, as well as their regulatory agency (the DGAC) are located in Indonesia, essential records and witnesses relevant to the Accident and this litigation are located in Indonesia. *See* Breuhaus ¶¶ 6, 8, 12, 14; Bartron ¶ 16.

## III.   ARGUMENT

The cornerstone of the FNC analysis is convenience. "The common law doctrine of [FNC] allows a trial court to dismiss a suit over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice." *Clerides*, 534 F.3d at 627-28 (quoting *In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 703 (7th Cir. 2005)). Specifically, an FNC dismissal is appropriate if there is an adequate alternative forum in which the case may be tried and the relevant private and public interest factors favor dismissal. *Kamel v. Hill-Rom Co.*, 108 F.3d 799 (7th Cir. 1997). In balancing these factors, plaintiffs' choice of a U.S. forum is entitled to little deference. This is so because when foreign plaintiffs bring suit in the U.S., their choice of forum cannot be presumed to be based on convenience. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007); *Piper Aircraft*, 454 U.S. at 256; *Clerides*, 534 F.3d at 628; In *re Factor VIII or IX Concentrate Blood Prods. Litig.*, 484 F.3d 951, 955-56 (7th Cir. 2007) ("*In re Factor II*").

The presence of a single U.S. plaintiff does not alter this conclusion or the balance of conveniences. *See Cheng*, 708 F.2d at 1411; *In re Athens*, 479 F. Supp. 2d at 798 (dismissing claims brought by two American plaintiffs and stating that "[t]he presence of American plaintiffs, by itself, does not bar forum non conveniens dismissal."); *In re Taiwan Straits*, 331 F. Supp. 2d at 1190 (plaintiffs' choice of forum not entitled to substantial weight where foreign plaintiffs "significantly outnumber" U.S. resident plaintiffs); *see also In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 190 F. Supp. 2d 1125, 1137 (S.D. Ind. 2002) ("[N]ot even U.S. citizenship is a talisman against [FNC] dismissal."). This is especially true where, as here, the U.S. resident plaintiff does not seek recovery for her own losses, but instead has simply been nominated by foreign (Indonesian) beneficiaries to bring suit on their behalf in a forum

10

(California) that has no factual connection to the litigation. *See Piper Aircraft*, 454 U.S. at 239 (even when Special Administrator is U.S. citizen and resident, forum choice not entitled to substantial difference when "real parties in interest are foreign."). As shown below, Indonesia is an available and adequate alternative forum for this litigation and—as in *Piper Aircraft* and its progeny—the public and private interest factors overwhelmingly favor dismissal.

## A. Indonesia Is an Available and Adequate Alternative Forum.

The first step in the FNC analysis is to determine whether an adequate alternative forum is available. "This is a two part inquiry: availability and adequacy." *Kamel*, 108 F.3d at 802. Courts have consistently held that Indonesia is an available and adequate alternative forum for personal injury and wrongful death cases. *See, e.g., Zipfel v. Halliburton Co.*, 832 F.2d 1477, 1484-85 (9th Cir. 1987), *amended on other grounds*, 861 F.2d 565 (9th Cir. 1988); *Gonzales v. P.T. Pelangi Niagra Mitra Int'l*, 196 F. Supp. 2d 482, 486-89 (S.D. Tex. 2002); *Carney v. Singapore Airlines*, 940 F. Supp. 1496, 1499-1501 (D. Ariz. 1996).[10] No reason exists to reach a different conclusion here.

The conclusion that Indonesia is an available and adequate alternative forum is confirmed by the declarations of Stefanus Haryanto and Priyatna Abdurrasyid, two Indonesian law experts. Haryanto is an Indonesian *Advokat* (litigator) who has practiced before all levels of Indonesian courts and, as a result, has extensive experience with Indonesian civil procedure and substantive law. Haryanto has also served as either a full- or part-time lecturer in law at Parahyangan Catholic University since he received his law degree 23 years ago. At Parahyangan, Haryanto has lectured in, among other subjects, Indonesian jurisprudence, International Law, and Commercial Law. His qualifications are explained in more depth in his declaration. Haryanto ¶¶ 2-8.

Priyatna is an air and space law expert with extensive experience lecturing in law at Indonesian universities and advising governmental entities on issues related to aviation law and regulation. Priyatna ¶¶ 5-10. He is the sole legal expert appointed by the President of Indonesia to the EKKT and is thus uniquely qualified to address matters of current aviation law in

---

[10] *See also PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74-75 (2d Cir. 1998) (Indonesia adequate in action for breach of contract and fiduciary duty and fraud); *PT Indopac Perdana Fin. v. Masagung*, Nos. 00-17345, 01-15622, 2002 WL 505915 (9th Cir. Apr. 1, 2002) (Indonesia adequate in action related to loan guarantee).

Indonesia. *Id.* ¶ 17. Priyatna also regularly provides training to Indonesian judges. *Id.* ¶ 7. Priyatna's qualifications are described in more detail in his declaration. *Id.* ¶¶ 5-10. These experts unequivocally confirm the availability and adequacy of Indonesia.

### 1. Indonesia is an available forum.

A forum is available where all parties are amenable to process and within the forum's jurisdiction. *Kamel*, 108 F.3d at 803. Here, Defendants are subject to the jurisdiction of Indonesian courts because the Accident occurred in Indonesia. Haryanto ¶ 35. Indonesia's availability is further ensured because Defendants have consented to accept jurisdiction there as a condition of dismissal. This consent, alone, establishes Indonesia's availability. *Id.* ¶ 38. *See In re Factor II*, 484 F.3d at 957; *Kamel*, 108 F.3d at 803.

Not only is Indonesia an available forum, for most of these plaintiffs' claims it is a mandatory forum. Because 192 of these plaintiffs previously released their claims against Boeing and UTC, their actions are barred unless they challenge the validity of the Releases. But these plaintiffs have previously agreed, through the Releases' Indonesian choice-of-forum clause, to litigate issues related to the Releases' validity only in an Indonesian District Court. Kendrick Exs. A-C; Haryanto ¶ 64. This forum selection clause is enforceable. Haryanto ¶ 66. At least with respect to those plaintiffs who are also "Releasors," therefore, FNC should be granted to effectuate the terms of their contractual forum selection. S*ee Tjontveit v. Den Norske Bank ASA*, 997 F. Supp. 799, 805 (S.D. Tex. 1998) ("A forum selection clause is presumably valid and creates a strong presumption favoring venue in the agreed-upon forum."); *see also Damigos v. Flanders Compania Naviera, S.A.-Panama*, 716 F. Supp. 104, 106-07 (S.D.N.Y. 1989) (forum selection clause in Greek release should be enforced).[11]

### 2. Indonesia is an adequate forum.

"An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly." *Kamel*, 108 F.3d at 803. Indonesia easily satisfies this low threshold requirement. Plaintiffs will not be deprived of "all" remedies in Indonesia. The Indonesian Civil Code provides victims a cause of action for "unlawful acts due to fault or negligence." Haryanto ¶¶ 42-46. Economic and noneconomic damages are available to surviving spouses, children and

---

[11] Given their prior selection of an Indonesian forum to settle such disputes, these plaintiffs cannot now question the adequacy of the Indonesian forum either.

parents who would have received financial support from a decedent. *Id.* ¶¶ 45, 48. As Haryanto explains, "[these provisions] give a plaintiff the right to file suit for damages for negligence or fault on the part of a defendant." *Id.* ¶ 46. Thus, as to any claims that are not otherwise barred by the Releases, Haryanto states that: "if the plaintiffs are able to submit the necessary evidence to demonstrate that Boeing and UTC committed unlawful acts which caused the Mandala crash, then based on Indonesian law, the claims for damages that they submit will be granted by the courts in Indonesia." *Id.* ¶ 74. Because Indonesia provides plaintiffs "some potential avenue for redress" it is an adequate forum. *Kamel*, 108 F.3d at 803 (internal quotations and citation omitted); *see also Piper Aircraft*, 454 U.S. at 254 & n.22.

Further, as demonstrated in the Haryanto and Priyatna declarations, Indonesia's judicial system contains sufficient procedural safeguards to assure its adequacy. The Indonesian judicial system is a civil law judicial system based on the European model. Haryanto ¶ 16. Plaintiffs would have easy access to Indonesian counsel and, indeed, many already have relationships with Indonesian counsel. Haryanto ¶ 39; Kendrick ¶ 13(r). After paying minimal filing fees, plaintiffs could file their cases in a District Court. Haryanto ¶¶ 18, 35-37, 40. The cases would be decided by a panel of three judges who must be qualified, trained, and approved by the Chief Justice of the Supreme Court and/or President of Indonesia. *Id.* ¶¶ 20-21, 25. Indonesian procedural rules provide for the collection of evidence (both documentary and testimonial) from parties and Indonesian third parties, as well as for the presentation of such evidence (including expert testimony) in court for examination by the judges and opposing counsel. *Id.* ¶¶ 57-59. Two levels of appeals are available. *Id.* ¶ 19. Although the procedures of the Indonesian courts differ from those in U.S. proceedings, that does not make the forum inadequate. *See Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*, 58 F. Supp. 2d 925, 929 (N.D. Ill. 1999) (citing *Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1352-53 (1st Cir. 1992)).

As the standard for adequacy is "easily met," *In re Athens*, 479 F. Supp. 2d at 797, this is not one of those "rare" situations in which the alternative forum may be deemed inadequate. *See PT United Can*, 138 F.3d at 73 ("At this stage, considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards, so such a finding is rare.") (citation omitted).[12] Both Haryanto and

---

[12] Further, as an example of the adequate functioning of the Indonesian court system, at least one plaintiff in a U.S. case filed claims there relating to the Accident. Plaintiff Lim A. Siong (who brings a wrongful

Priyatna underscore that not only is Indonesia an adequate forum for this litigation, it is the preferable forum. This litigation would be followed closely by the Indonesian government, press, and public, and the high profile nature of this litigation would facilitate the proper, efficient, and fair resolution of these claims. Priyatna ¶¶ 12, 27-29; Haryanto ¶¶ 69-73.

**B.    The Private Interest Factors Strongly Favor Dismissal.**

The private interest factors include the relative ease of access to sources of proof, availability of compulsory process for attendance of unwilling witnesses, the cost of obtaining attendance of willing witnesses, the possibility of viewing the Accident site, and "'all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)); *see also Clerides*, 534 F.3d at 628. Here, the private interest factors weigh heavily in favor of FNC dismissal.

**1.    The ease of access to sources of proof factor favors Indonesia.**

The majority of witnesses, documentary evidence, and physical evidence relating to the Releases, liability, and damages are located in Indonesia. Plaintiffs and their decedents—the overwhelming majority of whom are or were Indonesian—were injured or killed when an aircraft that had been maintained, inspected, and operated by Mandala, an Indonesian carrier, crashed near an Indonesian airport during a scheduled flight between two Indonesian cities. Most of these plaintiffs received compensation and executed Releases in Indonesia that relieved Boeing and UTC from further liability. Plainly, documents in Indonesia and the testimony of Indonesian witnesses will be of critical significance to this case. *See Clerides*, 534 F.3d at 629; *Paolicelli v. Ford Motor Co.*, No. 06-13688, 2008 WL 3855042, at *2 (11th Cir. Aug. 20, 2008) (affirming FNC dismissal where "accident-specific evidence such as witnesses and police and medical reports, relevant to both the damages incurred by the plaintiffs and the defenses available to [defendants], is concentrated in [the foreign forum]"); *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 836-37 (5th Cir. 1993) (affirming FNC dismissal of action where,

---

death action in the U.S. for the death of his brother Sui Liong) previously filed suit in Medan District Court on his own behalf and for his six siblings against Sui Liong's widow to resolve questions of inheritance and distribution of Sui Liong's assets and the settlement proceeds paid by Mandala. *See* Kendrick ¶¶ 8, 9 & Ex. D.

among other things, most of the evidence was located in Germany); *see also Da Rocha*, 451 F. Supp. 2d at 1323-24.

### a.          Evidence regarding the Releases is in Indonesia.

Evidence regarding the settlement negotiations, execution of the Releases, and tender of settlement funds will be necessary if 192 of these plaintiffs continue to pursue their previously released claims against Defendants. Of particular importance will be evidence from Mandala representatives who negotiated the Releases and paid the settlement funds. Other witnesses to the Releases and Indonesian notaries who verified plaintiffs' signatures will also be important. This evidence is of critical importance, as, by way of example, the plaintiffs in *Laksono* who signed Releases and obtained compensation after the Accident now claim that the Releases "were obtained under circumstances that render them void and unenforceable." Kendrick Exs. L, M. Because all but two of these Releases were executed in Indonesia, Mandala is located in Indonesia, and all the Releasors and their family members are in Indonesia,[13] essentially all necessary sources of proof relevant to this critical threshold issue are in Indonesia. *See* Kendrick Ex. C; Haryanto ¶¶ 62, 64, 67. None is in the U.S. This factor favors dismissal. *See Damigos*, 716 F. Supp. at 107-08.

### b.          Critical liability evidence is in Indonesia.

As outlined above, the Indonesian KNKT is leading the investigation into this loss of an Indonesian aircraft on takeoff from an Indonesian airport. As a result, much of the liability evidence relating to the Accident's probable cause is located there. While a detailed list of relevant documents and witnesses is not required, *see Piper Aircraft*, 454 U.S. at 258; *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 531 F. Supp. 2d 957, 975 (N.D. Ill. 2008) ("*In re Factor III*"), the following nonexhaustive description of liability evidence located solely in Indonesia suffices to demonstrate that access to evidence would be easier there.[14]

**Witnesses and records of the KNKT investigation and the wreckage assembled by the investigators.** The KNKT is a central source of evidence needed to determine the cause of the Accident. The systems plaintiffs complain about—most notably the airplane's engines, but also the flight control surfaces, flaps, and associated hardware—were taken into the KNKT's

---

[13] Two Releases were executed in China. Kendrick Ex. C.

[14] Other evidence is also in Indonesia. *See* Breuhaus ¶¶ 12, 14(a)-(e); Bartron ¶¶ 13-14, 16.

possession, as was all other recovered wreckage. Breuhaus ¶¶ 14(a), (b); *see Da Rocha*, 451 F. Supp. 2d at 1323; *Taiwan Straits*, 331 F. Supp. 2d at 1196 (both noting the location of wreckage as significant in FNC analysis). This physical wreckage is likely the best source of primary evidence to establish the Accident's cause. The KNKT has likely evaluated the aircraft engines and gathered and evaluated significant documentary and testimonial evidence from a variety of Indonesian sources in order to prepare its report on the Accident's cause. Breuhaus ¶ 12 (identifying evidence likely collected by the KNKT).[15] Because the KNKT conducted significant portions of its investigation in Indonesia without participation by the NTSB, Boeing, or UTC, access to KNKT evidence, witnesses, and records is critical to assembling the evidence necessary to prove the facts relevant to the cause of the Accident. *See Lueck*, 236 F.3d at 1146 ("New Zealand evidence relating to the accident is essential to this suit . . . ."); Breuhaus ¶¶ 12, 14(a).

**Witnesses and records of Mandala.** Mandala is also a critical source of evidence. At the very least, reports raise as an issue whether (and why) the flight crew failed to properly configure the aircraft for takeoff. Mandala has relevant evidence on this issue that is undoubtedly located in Indonesia. *See* Breuhaus ¶ 14(c); *see also* Priyatna ¶ 15. This includes evidence on (i) Mandala's flight operating procedures, including those regarding configuration of the aircraft for takeoff; (ii) the operating manuals available to the flight crew and whether they were approved by the DGAC; (iii) the qualifications and experience of the flight crew; and (iv) the training the flight crew received from Mandala, especially regarding Mandala's operating procedures, and reviews of the flight crew's performance of and adherence to such procedures. *See* Breuhaus ¶ 14(c).

Mandala also has evidence relevant to evaluating plaintiffs' allegations regarding the aircraft's engines, flaps, and warning systems. For example, evidence regarding Mandala's maintenance on the accident aircraft would shed light on whether Mandala had properly maintained the aircraft's engines, flaps, and warning systems. *See Van Schijndel*, 434 F. Supp. 2d at 776 (noting that "[i]n a products liability case . . . maintenance records may well be crucial" and granting FNC).

---

[15] Underscoring the importance of this evidence, some plaintiffs rely in their complaints on undocumented and anonymous statements from "investigators" about the engines in their complaints. *See* Laksono Amended Complaint ¶ 73 ("investigators have publicly stated that they 'discovered signs of engine problems'").

Finally, evidence of the procedures that Mandala and its personnel followed for maintaining, repairing, and operating the aircraft are particularly critical because some plaintiffs allege that Boeing failed to advise Mandala of proper maintenance, repair, and operating procedures. *See, e.g.*, Adi Complaint at Count II, ¶ 11; Kusumo Complaint ¶ 23(c), (e). These claims would fail on causation grounds, however, if it could be shown that Mandala never acquired or ignored recommendations from Boeing regarding maintenance, repair, and operation of the aircraft. All evidence of Mandala's procedures is in Indonesia. Breuhaus ¶ 14(c).

**Witnesses and records of Angkasa Pura II.** The Angkasa Pura II employees who participated in and were responsible for the Accident firefighting and rescue operations are key witnesses. These individuals, all of whom work[ed] at an Indonesian airport, can explain the delay in reaching the Accident site; what they saw when they arrived at the site; whether their efforts complied with the Polonia Airport Emergency Plan; and, if so, whether that emergency plan conformed with Indonesian law and international norms. *See* Breuhaus ¶ 12; *see also* Priyatna ¶ 16. This testimony is needed to determine whether the acts of Angkasa Pura II exacerbated the plaintiffs' injuries and/or losses, as has been previously reported. Indeed, in aviation accident litigation like this involving the loss of life and property on the ground, evidence from eyewitnesses (including airport personnel who witnessed the Accident) as well as from search and rescue teams that responded to the Accident is particularly critical. *See Zermeno v. McDonnell Douglas Corp.*, 246 F. Supp. 2d 646, 660 (S.D. Tex. 2003).

**Witnesses and records of DGAC regulation of the aircraft, airline, flight crew, and airport operator.** The DGAC inspected and certified the aircraft as airworthy regularly in the eleven years that it was operated by Mandala. Breuhaus ¶¶ 4, 5. The DGAC also regulated the flight crew, the airport operator, and the airline. *Id.* ¶¶ 5, 6, 12; Priyatna ¶ 27. This evidence in Indonesia points toward dismissal. *In re Athens*, 479 F. Supp. 2d at 800 (finding that ease of access to evidence favors Cyprus or Greece and noting that "records and witnesses relating to the Cyprus Department of Civil Aviation's oversight of Helios's operations are located in Cyprus").

      c.                **Damages evidence is in Indonesia.**

Indonesia is or was the home forum for almost all of the plaintiffs, wrongful death beneficiaries, and decedents in this case. Kendrick ¶ 13(e)-(i). Plaintiffs' responses to Boeing's discovery requests confirm that damages evidence is overwhelmingly found in Indonesia, with a

17

small amount in other Asian countries. *Id.* ¶ 13(d), (j)-(q).[16] Even in *Kusumo*, the case with a U.S. resident plaintiff, the damages evidence is located in Indonesia where the decedent resided, where his wife resides, and where his parents (the only claimed beneficiaries of the lawsuit) reside.

For the wrongful death and personal injury claims at issue here, the relevant damages evidence in Indonesia includes (i) the documents and witnesses necessary to evaluate plaintiffs' and the wrongful death beneficiaries' financial losses (including tax returns, bank records, pay stubs, employment records, and documents relating to funeral, mortuary, or burial expenses); (ii) documents and witnesses relevant to the personal injury plaintiffs' and decedents' pre- and post-accident medical conditions and life expectancies (e.g., doctors and other health care providers and their records); and (iii) documents and witnesses relevant to the intangible losses suffered by the loss of consortium plaintiffs, the personal injury plaintiffs, and the decedents' families.[17] Kendrick ¶ 13(j)-(q).

In suits arising from the injuries and/or deaths of foreign domiciliaries, courts have consistently held that the ease of access to sources of damages proof in the plaintiff's or decedent's home forum weighs heavily for dismissal. *See Chhawchharia v. Boeing Co.*, 657 F. Supp. 1157, 1161 (S.D.N.Y. 1987); *In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp 1141, 1147 (D.D.C. 1982). In an analogous foreign aviation accident case involving over 100 foreign decedents, the court recognized that the voluminous amount of damages evidence in the foreign forum, *standing alone*, made the overall ease of access to evidence greater abroad. *Taiwan Straits*, 331 F. Supp. 2d at 1196; *see also In re Bridgestone/ Firestone, Inc.*, 420 F.3d 702, 705 (7th Cir. 2005) ("*In re Bridgestone/Firestone II*"). No different conclusion is warranted here.

In sum, the "access to sources of proof" private interest factor plainly favors dismissal. Essentially all the Release and damages evidence is located in Indonesia. So, too, is much of the

---

[16] One decedent was apparently employed by a U.S. company and may have employment records in the U.S. However, that decedent (a doctor) lived and worked in Indonesia. Kendrick ¶ 13(n). Another Indonesian decedent had a sibling who resides in Canada and brings suit in the U.S. *Id.* ¶ 13(f). But in that case, the decedent and all other potential beneficiaries were and are Indonesian citizens and residents.

[17] 183 plaintiffs also seek compensation for property damages. They admit that all records relevant to these claims are outside the U.S.; most are in Indonesia, but some are in China. Kendrick ¶ 13(d).

critical liability evidence.[18] Courts confronted with cases like this one, where evidence

pertaining to the cause of foreign aviation accidents and the resulting damages is located abroad,

have considered this to be a strong factor favoring FNC dismissal. This case is no different. *See*

*Clerides*, 534 F.3d at 629-30; *Satz*, 244 F.3d at 1283-84; *Da Rocha*, 451 F. Supp. 2d at 1323-24;

*Van Schijndel*, 434 F. Supp. 2d at 776-77; *see also Kamel*, 108 F.3d at 804; *In re*

*Bridgestone/Firestone, Inc.*, 305 F. Supp. 2d 927, 937 (S.D. Ind. 2004) ("*In re*

*Bridgestone/Firestone I*"), *vacated*, 420 F.3d 702 (7th Cir. 2005), *judgment reinstated*, 470 F.

Supp. 2d. 917 (S.D. Ind. 2006).

### 2. Many critical witnesses are beyond the reach of compulsory process.

The Supreme Court in *Gulf Oil* recognized the importance of choosing a forum where

unwilling witnesses can be compelled to appear and testify. 330 U.S. at 511. The Seventh

Circuit also recently acknowledged the significance of this factor when affirming the dismissal

of claims arising out of a foreign aviation accident in *Clerides*, 534 F.3d at 629-30. In this case,

all the critical evidence relating to the Releases and damages, as well as many critical witnesses

relating to liability, are beyond this Court's compulsory process. Fed. R. Civ. P. 45(c)(3)(A)(ii),

(e); *Carney*, 940 F. Supp. at 1502-03. Given that 235 Indonesian plaintiffs have brought suit

here, the Indonesian witnesses on damages alone will be numerous. *In re Factor III*, 531 F.

Supp. 2d at 975. All this Indonesian evidence, however, would be available were this case

refiled there. Indonesian law contains mechanisms to compel production of documents from

parties and nonparties and to obtain the testimony of witnesses. Haryanto ¶¶ 58-59. This is a

significant factor in the FNC analysis. *Pain*, 637 F.2d at 787; *Dahl v. United Techs. Corp.*, 632

F.2d 1027, 1030 (3d Cir. 1980); *Carney*, 940 F. Supp. at 1503.

Compounding the prejudice caused by this lack of compulsory process, Indonesian courts

will likely ignore any request from this Court for judicial assistance to compel evidence in

Indonesia. Indonesia recognizes no treaty that facilitates the collection of evidence from

nonparties in Indonesia. *See* Haryanto ¶ 60.[19] While a party in the U.S. may try to obtain

---

[18] If the Release, liability, and damages issues are allowed to proceed in this Court, nearly all of the
relevant documents and testimony will require translation into English, with the accompanying delay,
cost, and potential for mistakes. This also favors dismissal. *Vasquez v. Bridgestone/Firestone, Inc.*, 325
F.3d 665, 672-73 (5th Cir. 2003).

[19] Some courts have found that the availability of such treaties (e.g., the Hague Convention) cures in
whole or in part the U.S. court's lack of compulsory process over foreign witnesses and documents, but

evidence in Indonesia through a letter rogatory, no Indonesian law facilitates the execution of a letter rogatory and it is unlikely that one such request would be enforced, let alone the significant number of requests that would be needed to obtain the vast amount of evidence located in Indonesia. *Id.* ¶ 60. *See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 21 & n.4 (1st Cir. 2004) (obtaining evidence through letters rogatory is "burdensome, costly, and time-consuming," and less certain than under the Hague Convention). Even if letters rogatory could be enforced, the Supreme Court and Seventh Circuit have affirmed that the superiority of live testimony and the inconvenience of obtaining evidence through such a process favors dismissal. *Gulf Oil*, 220 U.S. at 511; *Clerides*, 534 F.3d at 629-30.

Therefore, if this case remains in the U.S., Defendants will be unable to compel the production of documents, attendance at trial, or even the appearance at a deposition of third-party witnesses regarding Release issues, liability, or damages. *See supra* section III.B.1 (identifying the third-party Release, liability, and damages witnesses). With respect to the Release issues, the lack of compulsory process would be particularly prejudicial. Without compulsory process, Defendants have no way to obtain any testimony or documents from the ***only*** witnesses (all of whom are in Indonesia) whose testimony might contradict evidence that plaintiffs may offer (including their own declarations and declarations of friendly witnesses such as family members) to attack the Releases' validity.[20] This strongly favors dismissal. *Van Schijndel*, 434 F. Supp. 2d at 779 ("[C]ourts continue to affirm that it is not fair to make U.S. manufacturers proceed to trial without foreign witnesses who cannot be compelled to attend."); *Damigos*, 716 F. Supp. at 107 (FNC granted in favor of Greece noting that the "attorneys who negotiated the releases in the Greek action reside and work in Greece").

Voluntary production of Indonesian evidence will not substitute here for the lack of compulsory process. At the very least, Mandala has flatly refused to produce voluntarily its documents in the U.S. or permit its witnesses to testify for a U.S. trial. Kendrick Ex. C. No

---

the unavailability of such a treaty here coupled with the dismal prospects for letters rogatory in Indonesia distinguish those cases and tips this factor in favor of dismissal. *U.S.O. Corp. v. Mizuho Holding Co.*, No. 06 C 0459, 2007 WL 2893628, at *5 (N.D. Ill. Sept. 27, 2007).

[20] Defendants would similarly be prejudiced in their inability to compel evidence from Mandala, Angkasa Pura II, the DGAC, and the KNKT to demonstrate their defense that Mandala and Angkasa Pura II caused in whole or in part the Accident and resulting injuries. *See Nai-Chao v. Boeing Co.*, 555 F. Supp. 9, 18 (N.D. Cal. 1982) (compelling defendant to try case without benefit of testimony from accident investigators, aviation regulators, and aircraft operator "would impose a serious hardship").

20

reason exists to believe that other Indonesian third parties would take a different position. Even

if they did, it would still be far less burdensome and expensive for those voluntary witnesses to

appear in Indonesia rather than in a U.S. forum. This, too, favors dismissal. *See Paolicelli*, 2008

WL 3855042, at *2 (affirming FNC dismissal where the "plaintiffs and foreign witnesses also

face potentially inconvenient and expensive travel"); *Da Rocha*, 451 F. Supp. 2d at 1324;

*Pyrenee, Ltd. v. Wocom Commodities Ltd.*, 984 F. Supp. 1148, 1165 (N.D. Ill. 1997);

*McDonald's Corp. v. Bukele*, 960 F. Supp. 1311, 1318-19 (N.D. Ill. 1997).

### 3. In contrast, all relevant evidence in Defendants' control will be available in Indonesia.

That Boeing and UTC have evidence in the U.S. does not outweigh the factors that favor

Indonesia. Plaintiffs will have access to Defendants' evidence in an Indonesian action. First,

witnesses and documents within Defendants' control will be subject to the compulsory process

of the Indonesian court. *Alexander Proudfoot, Plc v. Fed. Ins. Co.*, 860 F. Supp. 541, 545 (N.D.

Ill. 1994); *see Lueck*, 236 F.3d at 1146. Second, Defendants' agreement, as a condition of

dismissal, to produce any evidence and employees deemed relevant by an Indonesian court

makes their evidence available in that forum. *See Clerides*, 534 F.3d at 629; *Lueck*, 236 F.3d at

1146; *Da Rocha*, 451 F. Supp. 2d at 1324; *Taiwan Straits*, 331 F. Supp. 2d at 1196.

The Seventh Circuit, in a foreign air crash case nearly identical to this one, recently

confirmed that the presence of liability evidence in the U.S. (particularly, Boeing's evidence)

does not tip the "ease of access to proof" factor in favor of a U.S. forum. *See Clerides*, 534 F.3d

at 629 ("The district court acted well within its discretion when it concluded that, given Boeing's

agreement to produce its documents and witnesses in Cyprus and Greece and the location of the

majority of other evidence in Cyprus and Greece, the relative ease of access to proof favored

those forums over the United States."). Because Defendants' evidence will be available in

Indonesia, while U.S. courts lack compulsory process over the multitude of critical witnesses and

documents located there, this private interest factor weighs heavily in favor of dismissal. *See*

*Lueck*, 236 F.3d at 1147 ("[B]ecause the district court cannot compel production of much of the

New Zealand evidence, whereas the parties control, and therefore can bring, all the United States

evidence to New Zealand, the private interest factors weigh in favor of dismissal."); *see also*

*Baumgart*, 981 F.2d at 836-37; *Gambra*, 377 F. Supp. 2d at 820; *Zermeno*, 246 F. Supp. 2d at

660.

21

**4.     It is likely not possible to join Mandala and is impossible to join Angkasa Pura II in this case.**

Neither Mandala nor Angkasa Pura II can likely be joined in U.S. litigation. Mandala likely lacks a sufficient connection to the U.S. (for example, it does not operate here and its personnel have not visited here) to demonstrate the requisite jurisdictional "minimum contacts." Underscoring this, Mandala has stated that "it will not agree to submit voluntarily to jurisdiction in the U.S. It does not believe that a U.S. court would have jurisdiction over it to require its participation." Kendrick Ex. C. Angkasa Pura II, as a company wholly owned by the Indonesian government, is a foreign sovereign as defined in the Foreign Sovereign Immunities Act and is therefore immune from suit in the U.S. *See* 28 U.S.C. §§ 1603(b)(2), 1604, 1605; *Compania Mexicana de Aviacion, S.A. v. U.S. Dist. Court*, 859 F.2d 1354 (9th Cir. 1988).

Defendants would be prejudiced by trials in the U.S. without Mandala and Angkasa Pura II. First, as Haryanto explains, under Indonesian law (which governs the Releases), Mandala and Angkasa Pura II should be joined in any action in which plaintiffs challenge the validity of the Releases. Their involvement in such an action is essential under Indonesian law and procedure. Haryanto ¶ 53.

Second, if Defendants can show that the Accident and injuries were caused solely by the negligence of the airline, the pilots, or the airport operator, they will be relieved of all liability. Here, where Mandala and Angkasa Pura II will only be "empty chairs," no judgment can be entered against them and Defendants will lack access to their evidence. *See supra* section III.B.2. This will seriously prejudice Defendants in their ability to fully and fairly defend these cases, and this factor weighs heavily in favor of dismissal. *See Piper Aircraft*, 454 U.S. at 259 ("Joinder of the pilot's estate, Air Navigation, and McDonald is crucial to the presentation of petitioner's defense."); *In re Factor II*, 484 F.3d at 958 (noting district court's reliance on the inability to join foreign third-party defendants as a private interest factor favoring dismissal); *Satz*, 244 F.3d at 1284 n.4 (noting the ineffectiveness of the "empty chair[]" defense because the trier of fact "would have available only one, rather than several, defendants to bear the brunt of its verdict and damage award"); *Van Schijndel*, 434 F. Supp. 2d at 780 ("the absence of [the operator] . . . creates the risk of significant prejudice to" defendants).

These difficulties would be eliminated if this case were refiled in Indonesia. There are a variety of ways that either plaintiffs or Defendants can join both Mandala and Angkasa Pura II in an Indonesian action. Haryanto ¶¶ 51-56. In fact, Indonesian jurisprudence mandates that all

01038-4931/LEGAL14626159.1

parties "closely related" to a case must be joined. *Id.* ¶ 54. FNC is therefore warranted to ensure that the actions can be refiled in Indonesia where all parties to the Releases and all possible tortfeasors may be brought before the same court. *See In re Factor III*, 531 F. Supp. 2d at 973 ("[T]he inability to join third parties is a substantial private interest factor weighing in favor of dismissal."); *Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 161 (S.D.N.Y. 2004).

### 5. An Indonesian fact-finder can view the accident site.

Viewing the accident site would provide context to the fact-finder and assist in the valuation of the claim for damage to property in the neighborhood adjacent to the Medan airport. Kendrick ¶ 13(b) (identifying at least one real property damage claim). It would also assist in explaining the route the emergency personnel took from the airport to the accident site and provide context for the apparent delayed emergency response. Accordingly, this factor favors dismissal. *Piper Aircraft*, 454 U.S. at 243; *In re Bridgestone/Firestone I*, 305 F. Supp. 2d at 936.

### C. The Public Interest Factors Also Strongly Favor Dismissal.

The public interest factors include the local interest in having localized controversies decided at home, the unfairness of burdening citizens in an unrelated forum with jury duty, administrative difficulties related to court congestion, and the avoidance of problems in conflicts of law or in application of foreign law. *Gulf Oil*, 330 U.S. at 508-09; *Kamel*, 108 F.3d at 803. The public interest factors also weigh heavily in favor of dismissal.

### 1. Indonesia has an overwhelming interest in deciding this dispute, far outweighing the interest of any possible U.S. forum.

There can be no dispute that Indonesia has a significant and overwhelming interest in this controversy. As a preliminary matter, Indonesia has a strong interest in whether the Releases, which were negotiated and executed in Indonesia by Indonesian parties, and that on their face extinguish liability arising out of an Indonesian air crash, are valid and enforceable. This is especially so since a determination about the Releases' validity could expose Mandala (one of its own corporations) to additional liability. *Chhawchharia*, 657 F. Supp. at 1161 ("India's interest in determining the validity and effect of the release is even greater [than the U.S. interest] . . . ."); *see also Damigos*, 716 F. Supp. at 109.

Indonesia's interest is even greater due to the nature of the underlying dispute. An aircraft operated by an Indonesian airline that is regulated by Indonesian authorities crashed on takeoff from an airport in Indonesia that is operated by a company owned by the Indonesian

government. The Accident injured and/or killed predominantly Indonesian passengers, crew, and ground victims, and it damaged an Indonesian neighborhood near the airport. Because the Accident occurred in Indonesia, Indonesian authorities are responsible for conducting the official accident investigation to determine the probable cause of the crash. These facts standing alone are sufficient to establish that Indonesia has a "very great" interest in the litigation. Priyatna ¶¶ 11, 14-16. *See Piper Aircraft*, 454 U.S. at 260; *Clerides*, 534 F.3d at 630; *In re Air Crash Near Peixoto De Azeveda*, No. 07 MD 1884, at *1; *Esheva*, 499 F. Supp. 2d at 500; *Taiwan Straits*, 331 F. Supp. 2d at 1204. Indonesia not only has a "great" interest in "ensuring that the heirs and beneficiaries of the majority of those on [the flight] are compensated and treated fairly," *Gambra*, 377 F. Supp. 2d at 825, but Indonesia also has a significant interest in "regulating the use of allegedly defective products within [its] borders" and "an interest in protecting the health and safety of [its] residents," *Clerides*, 534 F.3d at 630; *see also In re Bridgestone/Firestone II*, 420 F.3d at 705.

The recent initiatives taken by the Indonesian government to improve civil aviation safety in the wake of a series of accidents, including the Accident at issue here, underscore the significant interest that Indonesia has in this controversy. These initiatives include the creation and work of the EKKT; the safety audit and ranking of all Indonesian airlines; and the execution of a joint agreement with the International Civil Aviation Organization ("ICAO") to improve Indonesian civil aviation safety. Priyatna ¶¶ 22-26. The Indonesian government recently has accepted technical assistance on aviation issues from ICAO, the Australian government, and the Federal Aviation Administration. *Id.* ¶¶ 18, 21, 26. The Indonesian government has also temporarily or permanently suspended the licenses of numerous airlines that have been unable to meet certain aviation safety and security standards. *Id.* ¶ 24. Indeed, as Priyatna, an air and space law expert, legal advisor to the Indonesian Ministry of Transportation and the DGAC, and presidential appointee to the EKKT, states, in light of the Indonesian government's wholesale review of the Indonesian civil aviation infrastructure, Indonesia's interest in this case is "very significant." Priyatna ¶ 27; *see also In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*, 408 F. Supp. 2d 569, 589 (N.D. Ill. 2006) (*"In re Factor I"*) (governmental interest in regulated industry such as passenger aircraft operations is "particularly strong"), *aff'd*, 484 F.3d 951 (7th Cir. 2007). The Indonesian government's efforts to understand and prevent accidents like this one demonstrate a compelling interest in this case. *Cf. Clerides*, 534 F.3d at 630

24

(recognizing foreign governments' "demonstrated interest" in the case as shown through criminal and official investigations into the crash).

Given the Indonesian government's intense focus on civil aviation safety and the concomitant press coverage and public attention, this litigation would be followed closely by the public, the press, and the Indonesian government were it refiled in Indonesia. Priyatna ¶¶ 28, 29. As Priyatna concludes, this litigation would be "most fittingly hosted in Indonesia" where the Indonesian government and people could "oversee and derive direct benefit" from the litigation process. *Id.* ¶ 27. This consideration strongly favors dismissal. *See Esheva*, 499 F. Supp. 2d at 500 ("[L]itigation in Russia would allow the people most affected by the accident to have access to the litigation proceedings in a way that could never be achieved if the actions proceeded in this country."); *see also Gulf Oil*, 330 U.S. at 509 ("In cases which touch the affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report only.").

In contrast, no U.S. forum has an interest in this litigation that even approaches the interest of Indonesia, let alone surpasses it. Illinois, where the majority of these cases would be tried, has no meaningful relationship to this action. The fact that Boeing moved its corporate headquarters to Chicago long after it sold the accident aircraft does not give this forum an overriding interest in the litigation. *In re Factor III*, 531 F. Supp. 2d at 978 (presence of headquarters and manufacturing facility in forum was not "in any way comparable to the interests of [Argentina, where injuries occurred]"); *see also Lueck*, 236 F.3d at 1147; *Kamel*, 108 F.3d at 805 (both affirming FNC dismissals of defendants sued in their home forums); *McDonald's*, 960 F. Supp. at 1320 (principal place of business within forum "does not present much of a localized controversy"). This was recently confirmed by the Seventh Circuit in the nearly identical *Clerides* decision when it found that the Northern District of Illinois has "no local connection" to foreign air crash litigation against Boeing brought by foreign plaintiffs. 534 F.3d at 630. Thus, Illinois has little relationship to, and thus no more than a "mere passing" interest in, this action. *See Kamel*, 108 F.3d at 805; *see also Van Schijndel*, 434 F. Supp. 2d at 784; *Taiwan Straits*, 331 F. Supp. 2d at 1203; *In re Bridgestone/Firestone I*, 305 F. Supp. 2d at 938.

California has even less interest in this litigation than Illinois. None of the Defendants' activities relevant to this case occurred there. And although one of the 241 plaintiffs, Willy

25

Kusumo, appears to be a California resident, California has no interest in her claim. According to her own complaint, she is not the real party in interest in the case and seeks no recovery on her own behalf. *See infra* III.C.1. Further, she would not qualify as a beneficiary under Indonesian law or California law. Haryanto ¶ 45 (siblings not entitled to recover); Cal. Civ. Pro. C. § 377.60; Cal. Prob. C. (sibling cannot recover when decedent had surviving spouse and surviving parents). Under these circumstances, California has no meaningful interest in this litigation.

Nor do the interests of Washington even approach those of Indonesia, let alone tip the public interests away from dismissal. Arguably, Washington has some interest in the case filed there because Boeing's Commercial Airplanes division is located in Washington and because the Accident airplane was delivered there 27 years ago. But these facts alone do not create the type of public interest that justifies retention of these cases and imposition of jury duty on its citizens.[21]

This conclusion is squarely supported by *Piper Aircraft*. In that case, the Supreme Court reinstated the FNC dismissal of the case against Piper Aircraft, which had been pending in Pennsylvania where Piper Aircraft had its headquarters, manufacturing facilities, and its evidence. In doing so, the Supreme Court conclusively rejected the notion that that U.S. forum's interests either matched the foreign forum's interests or pointed away from dismissal. To the contrary, the Supreme Court unequivocally stated that "[t]he American interest in this accident *is simply not sufficient* to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here." *Piper Aircraft,* 454 U.S. at 261 (emphasis added).

Since *Piper*, "courts have repeatedly exercised their discretion to hold that a defendant's manufacturing activities within the U.S. do not tilt the public interest in favor of retaining jurisdiction where overseas events are the primary catalyst for litigation initiated by foreign plaintiffs." *In re Aircrash Near Peixoto de Azeveda*, No. 07 MD 1844, at 24 (dismissing cases filed in the Eastern District of New York where one corporate defendant's headquarters located and where two individual defendants lived). *See also Lueck*, 236 F.3d at 1147 (citizens of

---

[21] Likewise, even if claims are eventually filed in Connecticut where UTC has its headquarters, Connecticut's public interest in this litigation in no way approaches that of Indonesia, let alone tips the balance away from dismissal.

Arizona have "slight" interest in manufacturing of defective products by corporations located there as compared to "high" interest of foreign forum); *Baumgart,* 981 F.2d at 837 (dismissing German air crash case brought by German plaintiffs in the Western District of Texas against Texas-based aircraft manufacturer); *Gambra,* 377 F. Supp. 2d at 825 (California, the home of the defendant aircraft lessor, had "minimal" interest in litigation); *Helog AG v. Kaman Aerospace Corp.,* 228 F. Supp. 2d 91, 93 (D. Conn. 2002) (not in "public interest" to litigate product liability action against Connecticut-based manufacturers in Connecticut); *Jennings v. Boeing Co.,* 660 F. Supp. 796, 807 (E.D. Pa. 1987) (the interests of Pennsylvania, as place of the helicopter's manufacture, "are far less in comparison" to those of the place of the accident).

In sum, any generalized U.S. interest in deterring the production of defective products does not require a U.S. court to retain jurisdiction when another country has a greater interest in the litigation. *Piper Aircraft,* 454 U.S. at 260-61; *In re Athens,* 479 F. Supp. at 804; *Da Rocha,* 451 F. Supp. 2d at 1325; *Taiwan Straits,* 331 F. Supp. 2d at 1205. In this case, the presence of U.S. manufacturers does not alter the Indonesian nature of and interest in this dispute and this public interest points strongly to dismissal. *See Macedo v. Boeing Co.,* 693 F.2d 683, 686 (7th Cir. 1982) ("The fact that the aircraft was manufactured in the [United States] does not make the accident, involving a Portuguese airline, an airport in Portugal, predominantly Portuguese plaintiffs and Portuguese witnesses, any less a matter of local Portuguese interest.").[22]

Here, the interest of Indonesia in this litigation is not only significant, but "present and continuing." *See In re Factor III,* 531 F. Supp. 2d at 978. ("[T]he forum of these plaintiffs' [and decedents'] residence [is] the place where the greatest impact of their injuries has been felt and will continue to be felt into the indefinite future."). In contrast, any interest that Washington and Connecticut have is tied, in large part, to the design and manufacture of an airplane and its engines that were delivered more than 27 years ago. *See id.* Under these circumstances, the interest of the local U.S. forum where Defendants are located and have their operations simply

---

[22] In *Macedo,* which arose out of a Portuguese air crash, the Seventh Circuit reversed the district court's FNC dismissal because the district court had not fully considered all of the *Gulf Oil* factors. *See Macedo v. Boeing Co.,* 693 F.2d 683 (7th Cir. 1982). On remand, after a careful analysis, the district court once against granted the FNC motion and the case was dismissed. *See Boskoff v. Boeing Co.,* 17 Avi. 18,613 (N.D. Ill. June 1, 1983) (Kendrick Ex. J). And, in the intervening 23 years since *Macedo,* courts have routinely dismissed cases on similar facts. *See supra* n.2.

"pales" in comparison to those of the foreign forum where the plaintiffs and decedents are, or were, from, where the Accident occurred, and where the airplane was operated and maintained. *See In re Aircrash Near Peixoto de Azeveda*, No. 07 MD 1844, at 24.

**2. There is no reason to burden any U.S. court or jury with resolving litigation in which Indonesia has such a significant and overwhelming interest.**

Maintaining these actions in any U.S. forum would create a significant burden on the Court and jurors, out of proportion to their, at best, limited interest in these cases. This is particularly true for the Illinois and California forums, which have no meaningful connection to the litigation, *see In re Factor III*, 531 F. Supp. 2d at 979, and it is also true for the Washington forum, *Baumgart v. Fairchild Aircraft Corp.*, Civ. A. No. SA-90-CA-818, 1991 WL 487242, at *7 (W.D. Tex. Sept. 30, 1991) (trials involving 19 foreign plaintiffs would take a substantial amount of time to try and public interest factors favored dismissal even though aircraft designed, manufactured, and tested in Texas), *aff'd*, 981 F.2d 824 (5th Cir. 1993); *Nolan v. Boeing Co.*, 762 F. Supp. 680, 684 (E.D. La. 1989), ("no justification" for retaining jurisdiction when trials arising from foreign aviation accident involving 100 plaintiffs "could be expected to last months"), *aff'd*, 919 F.2d 1058 (5th Cir. 1990). *See also In re Factor III*, 531 F. Supp. 2d at 979.

The heavy burden that these cases would impose on three different U.S. forums is not justified by the, at most, slight interest each forum has in the litigation. Each court and set of jurors would be forced to delve into complex issues relating to an Indonesian airline's flight operations, crew training, and maintenance; issues related to the proper design and implementation by a state-owned Indonesian company of emergency plans for an Indonesian airport; and engineering questions regarding the proper design, manufacture and operation of a 737-200 aircraft and its engines. In addition, each court and set of jurors would be required to sift through damages claims arising from injuries, deaths, and property damage of Indonesian passengers, ground victims, and wrongful death beneficiaries, all of whom were or are foreigners and none of whom resides in the U.S. This would be an unfair burden to impose on jurors in forums with little or no present interest in plaintiffs' claims. *See Lueck*, 236 F.3d at 1147 ("the citizens of Arizona should not be forced to bear the burden" because interest of forum as the home of manufacturer was "low" compared to interest of New Zealand as the home of airline and passengers); *In re Athens*, 479 F. Supp. 2d at 804; *In re Factor I*, 408 F. Supp. 2d at 588 (individual trials in hemophiliac/HIV cases would "require many months of court time").

Conversely, adjudicating these cases in Indonesia would enable the people most affected—the victims and their families, residents of the neighborhood where the crash occurred, and the Indonesian public—to have direct access to the trial. *See Esheva*, 499 F. Supp. 2d at 500; *Van Schijndel*, 434 F. Supp. 2d at 783-84; *Helog*, 228 F. Supp. 2d at 93 ("[T]rying the case to a jury far from the place of the accident (and plaintiffs' domiciles) is not in the public interest."). Given the significantly greater Indonesian interest in this case, the jury service factor strongly favors dismissal. *In re Athens*, 479 F. Supp. 2d at 804; *see also Piper Aircraft*, 454 U.S. at 252; *In re Bridgestone/Firestone II*, 420 F.3d at 705.[23]

### 3. Dismissal would avoid unnecessary conflict of laws problems and the necessity of applying Indonesian law.

FNC "is designed in part to help courts avoid conducting complex exercises in comparative law." *Piper Aircraft*, 454 U.S. at 251; *In re Athens*, 479 F. Supp. 2d at 804-05. Cases arising from foreign aircraft accidents inevitably "pose complex choice of law issues." *In re Athens*, 479 F. Supp. 2d at 804; *see also In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*, No. MDL 1448, 2006 WL 1288298, at *4 (S.D.N.Y. May 9, 2006). Because retention of this action would require the Court to "'untangle problems in conflict of laws, and in law foreign to itself,'" this public interest factor (like all the other factors) "point[s] towards dismissal." *Piper Aircraft*, 454 U.S. at 251 (quoting *Gulf Oil*, 330 U.S. at 509).

First, if the Court were to address any questions regarding the Releases' validity, it would have to "untangle" Indonesian law, which must apply to those issues by virtue of the Releases' choice-of-law clause. Haryanto ¶ 63; *see also Damigos*, 716 F. Supp. at 108 n.5 (FNC granted when Greek law deemed likely to apply to release executed in Greece by Greek citizens in case involving a Greek vessel). Second, in addressing liability and damages issues, the Court would also be required to engage in the type of complex choice-of-law analysis that FNC is designed to avoid. *Piper Aircraft*, 454 U.S. at 251.

To determine which law applies to any issue the court must apply the choice-of-law rules of the forum. Illinois and Washington have adopted the "most significant relationship" test. *See*

---

[23] Were these cases refiled in Indonesia, they would likely be resolved in the District Court within six months (*see* Haryanto ¶ 41), as opposed to a median time to trial of 28.7 months in the Northern District of Illinois, 18.9 months in the Central District of California, and 19 months in the Western District of Washington (Kendrick Ex. I). The relatively shorter time to trial in Indonesia further supports dismissal. *In re Factor II*, 484 F.3d at 958-59.

*Esser v. McIntyre*, 169 Ill. 2d 292, 298 (1996); *Ellis v. Barto*, 918 P.2d 540, 542 (Wash. Ct. App. 1996) (citing *Johnson v. Spider Staging Corp.*, 555 P.2d 997 (Wash. 1976)).[24] According to that test, the law of Indonesia—where the injuries occurred—should govern, unless another state or country has a more significant relationship with the occurrence and with the parties. *See, e.g.*, *Esser*, 169 Ill. 2d at 298. Selection of the jurisdiction with the most significant relationship requires analysis of each competing jurisdiction's contacts with the occurrence and the parties, in light of the policies underlying the conflicting laws. *Id.* Maintenance of these cases would require a separate choice-of-law analysis with respect to each legal issue for which a conflict exists between Indonesian law and the law of another jurisdiction—be it an issue relating to compensatory damages or liability. *See In re Air Crash Disaster Near Chi., Ill., on May 25, 1979*, 644 F.2d 594, 611 (7th Cir. 1981); *see also Esser*, 169 Ill. 2d at 298; Restatement (Second) of Conflict of Laws § 145(1) & cmt. d at 414, 417 (1971).[25]

With respect to the legal issues relating to compensatory damages, the Court here would be called upon to sort through an area rife with potential conflicts. For example, the Court must address a conflict between Indonesian law and the laws of Washington and Illinois as to the identity of proper wrongful death beneficiaries. *Compar*e Haryanto ¶ 45 (dependent parents are beneficiaries), *with Holmgren v. Nat'l Big-4 Asbestos Removal Specialty, Inc.*, 228 Ill App. 3d 433, 435 (1992) (under Illinois law, parents not beneficiaries when spouse survives) *and Philippides v. Bernard*, 88 P.3d 939, 943-44 (Wash. 2004) (under Washington law, parents can recover only if dependant on decedent and no spouse or children survive). Further, while Indonesian law generally allows the recovery of material and nonmaterial losses, the Court would also be required to define more precisely the exact types of material and nonmaterial damages recoverable under Indonesian law as compared to the laws of Illinois, Washington, and California.

---

[24] Assuming cases are also filed in Connecticut, that state, too, has adopted the "most significant relationship" choice-of-law test. *Dugan v. Mobile Med. Testing Servs., Inc.*, 830 A.2d 752, 759 (Conn. 2003).

[25] California applies a three-step governmental interest analysis to address choice-of-law issues, which involves (i) identification of any conflict of laws on each issue, (ii) evaluation of the interests of any jurisdiction in having its own law applied; and (iii) an analysis of which jurisdiction's interests would be more impaired if its laws were not applied. *See, e.g.*, *Tucci v. Club Mediterranee, S.A.*, 107 Cal. Rptr. 2d 401, 407 (Cal. Ct. App. 2001). The separate analysis required under California law only further complicates the web of choice-of-law issues the Court would be required to untangle if the cases remain here. *Piper Aircraft*, 454 U.S. at 251.

A similar analysis must be done with respect to a determination of the liability rules that will apply to Boeing and UTC. *See Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844-46 (7th Cir. 1999) (applying foreign liability law of country where injuries occurred). This analysis would be even more complicated given that the injuries occurred in Indonesia, plaintiffs' claims against Boeing and UTC arise from conduct that took place in Washington and Connecticut, respectively, and additional claims have been filed in three different U.S. forums.

While this choice-of-law analysis is, at best, complex, one thing is clear: given Indonesia's significant relationship to the Accident and the parties, it is likely that if this case remains here, the Court would be required to apply Indonesian law to many issues. *See Macedo*, 693 F.2d at 690 ("Portuguese law would surely be applicable to many" issues in litigation of Portuguese air crash and decedents). Dismissal in favor of refiling in Indonesia would relieve the Court of this complicated choice-of-law analysis and the application of foreign law. *In re Aircrash Near Peixoto De Azeveda*, No. 07 MD 1844, at 25-26 (choice-of-law factor points to dismissal because dismissal allowed court to avoid "unnecessary problems in conflict of laws" and multiple conflict-of-laws analyses). This factor thus points strongly in favor of dismissal. *Kamel*, 108 F.3d at 805 (FNC granted when court would have to "presid[e] over a trial in which it would have to delve into the tenets of an unfamiliar legal system"); *Alexander Proudfoot*, 860 F. Supp. at 545 (application of foreign law "strongly points toward dismissal in considering a [FNC] claim"); *see also Satz*, 244 F.3d at 1284 (FNC granted given "possibility" that the court would have to apply foreign law).

## IV. CONCLUSION

Indonesia is an available and adequate alternative forum for plaintiffs' claims. As the home forum for the vast majority of these plaintiffs (and their decedents), as well as the site of the Accident and the domicile of the airline, Mandala, the airport operator, Angkasa Pura II; their regulator, the DGAC; and the investigating KNKT agency, the private and public interest factors strongly favor Indonesia over the U.S. These factors tip overwhelmingly in favor of Indonesia

when the Releases are considered. Boeing and UTC therefore respectfully request that the Court dismiss plaintiffs' claims on the grounds of FNC.

DATED: August 29, 2008

Respectfully submitted,

/s/ William T. Cahill
One of the attorneys for
Defendant The Boeing Company

William T. Cahill
Jonathan R. Buck
PERKINS COIE LLP
131 South Dearborn Street, Suite 1700
Chicago, IL 60603-5559
(312) 324-8400

Allison Kendrick
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
(206) 359-8000

/s/ William F. DeYoung
One of the attorneys for
Defendant United Technologies
Corporation

William F. DeYoung
Loretto M. Kennedy
Kendall E. Woods
CHUHAK & TECSON, P.C.
30 S. Wacker Drive, Suite 2600
Chicago, IL 60606
(312) 444-9300

32

## CERTIFICATE OF SERVICE

I, Jonathan R. Buck, certify that I caused a true and complete copy of the

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR**

**AMENDED MOTION TO DISMISS ON THE GROUNDS OF FORUM NON**

**CONVENIENS** to be served via CM/ECF and/or regular U.S. mail, postage prepaid, from 131

South Dearborn Street, Suite No. 1700, Chicago, Illinois 60603, on the 29th day of August, 2008,

upon all counsel of record on the attached service list:


_____/s/William T. Cahill_____

## SERVICE LIST

**Via Court's electronic filing system to the following:**

| | |
|---|---|
| **Counsel for Plaintiffs in**<br>*Adiputra,* **et. al. (07 C 0250)**<br>*Adi,* **et. al. (07 C 4954)** | Floyd A. Wisner<br>WISNER LAW FIRM<br>934 South 4th Street<br>St. Charles, Illinois 60174<br>Phone: (630) 513-9434<br>Fax: (630) 513-6287 |
| **Counsel for Plaintiffs in**<br>*Adiputra,* **et. al. (07 C 0250)** | Brian J. Lawler<br>LIEFF GLOBAL LLP<br>275 Battery Street, 30th Floor<br>San Francisco, California 94111<br>Phone: (415) 788-8000<br>Fax: (415) 956-1008 |
| | Robert J. Nelson, Esq.<br>LIEFF, CABRASER,<br>HEIMANN & BERNSTEIN, LLP<br>275 Battery Street, 30th Floor<br>San Francisco, California 94111-3336<br>Phone: (415) 956-1000<br>Fax: (415) 956-1008 |
| **Counsel for Plaintiffs in**<br>*Justyantoro,* **et. al. (07 C 1387)**<br>*Zu,* **et. al. (07 C 4845***)* | Joseph A. Power, Jr.<br>Todd A. Smith<br>Brian LaCien<br>POWER, ROGERS & SMITH, P.C.<br>70 West Madison Street<br>Suite No. 5500<br>Chicago, Illinois 60602<br>Phone: (312) 236-9381<br>Fax: (312) 236-0920 |

| | |
|---|---|
| **Counsel for Defendant**<br>*United Technologies Corporation* | William F. DeYoung<br>Loretto M. Kennedy<br>CHUHAK & TECSON<br>30 S. Wacker Drive<br>Suite No. 2600<br>Chicago, Illinois 60606<br>Phone: (312) 444-9300<br>Fax: (312) 444-9027 |
| **Counsel for**<br>*The Boeing Company*<br>**(All Cases)** | William T. Cahill<br>Jonathan R. Buck<br>PERKINS COIE, LLP<br>131 South Dearborn<br>Suite No. 1700<br>Chicago, Illinois 60601<br>Phone: (312) 324-8400<br>Fax: (312) 324-9400 |
| | Allison Kendrick<br>PERKINS COIE, LLP<br>1201 Third Avenue<br>Suite No. 4800<br>Seattle, Washington 98101-3099<br>Phone: (206) 359-8000<br>Fax: (206) 359-9000 |

**Via regular U. S. mail to the following:**

| | |
|---|---|
| **Counsel for Plaintiffs in**<br>*Kusumo*, **et. al. (08 C 2358/3324)**<br>*Laksono*, **et. al. (08 C 2359/3325)** | Lewis S. Eidson<br>Curtis B. Miner<br>COLSON HICKS EIDSON<br>225 Aragon Avenue<br>Second Floor<br>Coral Gables, Florida 33134<br>Phone: (305) 476-7400<br>Fax: (305) 476-7444 |